# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PBS Coals, Inc. and Penn : 
Pocahontas Coal, Co., : 
          Appellants : 
                  :   No. 140 C.D. 2018
        v. : 
                  :   Argued: February 14, 2019
Commonwealth of Pennsylvania, : 
Department of Transportation : 

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE ELLEN CEISLER, Judge

OPINION BY
JUDGE McCULLOUGH                         FILED: March 28, 2019

        PBS Coals, Inc. and Penn Pocahontas Coal, Co. (collectively, the Coal Companies) appeal from the January 19, 2018 order of the Court of Common Pleas of Somerset County (trial court) sustaining the Pennsylvania Department of Transportation's (PennDOT) preliminary objections to the Coal Companies' petition for the appointment of a board of viewers (Petition), which alleged that PennDOT's actions constituted a *de facto* taking of the Coal Companies' coal estate and coal interest on a parcel of property in Somerset County.

## Facts and Procedural History

        This case involves the construction of a portion of U.S. Route 219, an 11-mile limited access highway, in southern Somerset County. As part of the construction, PennDOT condemned property in a north-south direction. (Trial court op. at 1.) The Coal Companies allege that the construction of Route 219 deprived them of their access

and right-of-way to a certain parcel of property, Parcel 55, in Brothersvalley, Pennsylvania, for which it owned the coal estate and coal interest.

In 2010, when the Coal Companies allege that the *de facto* taking occurred, Penn Pocahontas was not active in the mining business; rather, its primary source of income was derived from acquiring coal reserves and leasing them to active mining companies, which then paid Penn Pocahontas a royalty on the coal sales. (Trial court op., findings of fact (F.F.) Nos. 2-3.) In 2006, Penn Pocahontas entered into a lease agreement with the owners of Parcel 55 whereby it gained the right to mine all the subsurface coal on Parcel 55. (F.F. No. 5.) Thereafter, in 2007, Penn Pocahontas entered into a lease agreement with PBS Coals, whereby PBS Coals gained the right to mine all the coal underlying Parcel 55, including both the Brookville seam and the Clarion Rider seam, which were the only coal seams present on the parcel. (F.F. Nos. 5-6.) Additionally, in 2006, PBS Coals entered into a coal lease with respect to Parcel 59, which was then owned by Jean C. Shaffer (the Shaffer Lease). (F.F. Nos. 32-33.) The Shaffer Lease granted PBS Coals the right to mine all of the surface and subsurface coal on Parcel 59. (F.F. No. 34.)

Both Parcels 55 and 59 lay to the west of Route 219. Parcel 59 lays northwest of, but does not abut, Parcel 55. (Reproduced Record (R.R.) at 139a; Supplemental Reproduced Record (S.R.R.) at 71b.) Located east of Parcel 59 and north of Parcel 55, and adjacent to both parcels, is Parcel 56. *Id.* Directly north of and fronting Parcel 59 is Mud Pike Road. *Id.* Situated east of Parcel 55 is Garrett Shortcut Road; however, Parcel 55 does not front Garrett Shortcut Road. *Id.* Rather, Parcels 50 and 54 lay to the east of Parcel 55 and in between Parcel 55 and Garrett Shortcut Road. Following its construction, Route 219 bisects and is situated on Parcels 54 and 50, between Parcel 55 and Garrett Shortcut Road. (R.R. at 138a.) Finally, located southwest of Parcel 55 is the Hoover Parcel. Although the Hoover Parcel fronts Blackfield Road, Parcel 55 does not front the same. (R.R. at 139a, S.R.R. at 71b.)

2

While Parcel 55 has always been landlocked, the Coal Companies claimed in their Petition that their right-of-way to Parcel 55 was inaccessible due to the construction of Route 219. (Petition ¶13.) The Coal Companies did not claim that PennDOT physically condemned Parcel 55; instead, the Coal Companies asserted that, because of the construction of Route 219, the coal under Parcel 55 is now isolated and incapable of being mined. *Id.* ¶14. The Petition alleged that the loss of access to Parcel 55 constituted a *de facto* taking by PennDOT of the same. *Id.* ¶19. The Petition requested that the trial court appoint a board of viewers to ascertain the just compensation that should be awarded the Coal Companies for the *de facto* taking of Parcel 55. *Id.* ¶24. In response to the Petition, PennDOT filed preliminary objections asserting that a *de facto* taking had not occurred because the Coal Companies were not deprived of the beneficial use and enjoyment of their property due to any action of PennDOT; the Coal Companies did not suffer any depreciation in the value of their property; PennDOT's actions did not cut off the Coal Companies' access to Parcel 55 because there was alternative access; and at the time PennDOT condemned the property for the construction of Route 219, the Coal Companies had not applied for any mining permits for Parcel 55.

The trial court conducted a three-day hearing from February 14-16, 2017. At the hearing, the Coal Companies presented evidence that prior to the alleged condemnation, they had access from Parcel 55 to Garrett Shortcut Road via rights-of-way over Parcels 54 and 50. (F.F. Nos. 7-8.) While the Coal Companies claimed that they had rights-of-way leading from Parcel 55 to Garrett Shortcut Road, the relevant deeds conveying the rights-of-way did not define the actual location of the rights-of-way, with only a general direction and description given, and the Coal Companies never attempted to define the route for their rights-of-way. (F.F. Nos. 12-14.) The construction of Route 219 resulted in Parcels 54 and 50 being bisected by the new

highway and, thus, the rights-of-way leading from Parcel 55 across Parcels 54 and 50 in an easterly direction toward Garrett Shortcut Road were severed. (F.F. No. 16.)

The type of land use proposed by the Coal Companies for access from Garrett Shortcut Road to the right-of-way for Parcel 55, located on Parcel 54, would require a highway occupancy permit (HOP) from PennDOT. (F.F. No. 17.) The Coal Companies never applied for an HOP for the right-of-way, and PennDOT alleged that the Coal Companies lacked sufficient access frontage on Parcel 54 for an HOP. (F.F. No. 22.)

At the hearing, PennDOT indicated, over the objections of the Coal Companies, that it was prepared to construct a temporary bridge across Route 219, before the Coal Companies extracted any coal, which would thereby prevent them from ever being deprived of access to Parcel 55. (F.F. No. 24.) PennDOT presented a plan to build a temporary bridge across Route 219 to transport coal from Parcel 55, and asserted that it would be of sufficient strength to support any load allowed on the roadways of the Commonwealth. (F.F. Nos. 25-26.) However, between 2010 and 2017, PennDOT did not have any plans in place for the construction of a temporary bridge over Route 219; therefore, the Coal Companies argued that any testimony concerning the construction of the same was totally speculative and should be disregarded. (F.F. Nos. 27-28.)

PennDOT also attempted to demonstrate at the hearing that the Coal Companies had alternative access to Parcel 55 by virtue of the Shaffer Lease and the Coal Companies' interest in the coal on Parcel 59. The Shaffer Lease granted PBS Coals mining rights on Parcel 59 for a primary term of seven years and "so long thereafter as active mining is being conducted on the Premises or on a mine which has or will include the Premises," and provided that the Shaffers agreed to "execute and sign any documents required to be signed by [PBS Coals] in connection with obtaining

4

or maintaining a mining permit on the Premises." (Shaffer Lease at 8, S.R.R. at 8b; F.F. Nos. 34-35.)

Further, PennDOT attempted to show that the Coal Companies could access Parcel 55 via a right-of-way across the Hoover Parcel to Blackfield Road. (F.F. Nos. 42-43.) PBS Coals previously had entered into a coal lease with respect to the Hoover Parcel. (F.F. No. 44.) However, the lease had terminated by the time of the alleged *de facto* condemnation and the trial court concluded there was no evidence that the lease had been reinstated or that PBS Coals had an ongoing right to traverse the Hoover Parcel from Parcel 55 to Blackfield Road. (F.F. Nos. 45-46.)

Finally, the parties introduced conflicting evidence regarding the mineability of Parcel 55, specifically about whether the Pennsylvania Department of Environmental Protection (DEP) would issue a permit for a mine on Parcel 55. Louis T. Pierce, a registered professional geologist, who was accepted as an expert in geology and hydrology, testified that there were no streams on Parcel 55 and that there were less than two acres of wetlands on the same. (F.F. No. 50.) Pierce testified that all of the wetlands on the property could be mitigated. (F.F. No. 51.)

Robert Kudlawiec, a licensed professional engineer, who was accepted as an expert in mine planning, operations, permitting, and engineering, testified regarding the potential for obtaining a mining permit for Parcel 55 from DEP. (F.F. No. 52.) Kudlawiec explained that when a mining permit is sought from DEP and there are intermittent streams present, the permit may be issued if the stream is removed, replaced, or enhanced. (F.F. No. 53.) He also testified that wetlands are mitigated by establishing a replacement wetland. (F.F. No. 54.) Kudlawiec stated that any streams or wetlands on Parcel 55 could be mitigated and that the cost of mitigation was factored into his determination of the economic mineability of Parcel 55. (F.F. No. 55.) In his opinion, an intermittent stream or wetland would not prevent the issuance of a mining permit from DEP as long as corrective measures were taken. (F.F. No. 56.) He further

5

noted that another acceptable method for mitigating a stream or wetland is to construct a "high wall mine" below the level that the stream can be affected. (F.F. No. 57.) Kudlawiec believed that DEP's wetlands and stream requirements for mining permits are similar to DEP's requirements for highway permits. (F.F. No. 58.) He noted that DEP issued PennDOT permits to mitigate streams and wetlands when constructing Route 219 across Parcels 50 and 54. (F.F. No. 59.) PennDOT's experts acknowledged that the environmental standards PennDOT was required to meet to construct Route 219 were similar to those required for a mining permit, that PennDOT obtained all of the necessary environmental permits for Route 219, and that the excavation overburden for the Route 219 project was greater than it would be for a surface mine on Parcel 55. (F.F. Nos. 65-66.)

Both of the Coal Companies' experts testified that the presence of the Indiana bat in Somerset County would not have been an impediment for obtaining a mining permit from DEP for Parcel 55. (F.F. No. 60.) Both experts also stated that the possibility of acid mine drainage on Parcel 55 could have been mitigated by alkaline additions and that alkaline additions are recognized by DEP as a way to reduce acidic overburden in the permitting process. (F.F. Nos. 61-64.) Kudlawiec opined with a reasonable degree of certainty that a surface mine to extract the coal on Parcel 55 was permittable by DEP and that, therefore, the coal was mineable. (F.F. No. 67.) Pierce also testified that the surface mine was permittable by DEP from a geological and hydrogeological standpoint. (F.F. No. 68.)

DEP's Ebensburg District Mining Manager, Daniel Sammarco, testified on behalf of PennDOT. (F.F. No. 69.) He testified that his office handles surface mine permit applications, that his responsibilities include ensuring that the permitting process complies with the Surface Mining Conservation and Reclamation Act,[1] and

---

[1] Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §§1396.1-1396.31.

6

that a mining permit may be denied for either administrative or technical deficiencies. (F.F. Nos. 69-72.) He stated that nothing had been presented by the Coal Companies or PennDOT that would necessarily prevent a permit for surface mining on Parcel 55, but in order to opine on such a permit it was necessary to wait until a full review of the formal application had occurred. (F.F. No. 69.) Sammarco noted that the failure to properly address potential environmental impacts to streams and wetlands are mining permit technical deficiencies, and that the Coal Companies' experts had not testified to studying stream and wetland impacts or performing an overburden analysis, which are essential for the permitting process. (F.F. No. 76.) Sammarco also explained that another factor in the permitting process for Parcel 55, should it be initiated, would be the post-mining discharge from PBS Coals' separate Job 21, which had resulted in an enforcement action against PBS Coals and the institution of a perpetual remediation plan for acid mine discharge. (F.F. No. 77.) Sammarco testified that he could not state with a reasonable degree of certainty that his office would grant a permit for a surface mine on Parcel 55. (F.F. No. 78.) Additionally, notes written by DEP "tech chief," Tim Kania, in 2005, expressed skepticism about further mine permitting for the Brookville seam due to past problems with groundwater quality, coal seam overburden, large alkaline addition rates, and the high potential for additional pollution. (F.F. No. 79.) Finally, PBS Coals demonstrated that it obtained a deep mine permit for a parcel of property just north and east of Parcel 55 (A-seam mine) and that the permit included a surface mining component. (F.F. No. 81.)

The trial court concluded that the Coal Companies had leasehold rights to extract and sell the coal and to the royalty income for Parcel 55. (Trial court op., conclusions of law (C.L.) Nos. 85-86.) The trial court determined that on June 10, 2010, a right-of-way existed leading from Parcel 55 across Parcels 54 and 50 to Garrett Shortcut Road. (C.L. Nos. 87-88.) The trial court held that Parcel 55 became landlocked due to the construction of Route 219, which severed the then-existing

7

rights-of-way across Parcels 54 and 50, and that the physical existence of Route 219 precluded the removal of coal from Parcel 55 in an easterly direction to Garrett Shortcut Road. (C.L. Nos. 89-90.)

The trial court explained that in order to establish a *de facto* taking, the Coal Companies had to show that there were exceptional circumstances that substantially deprived them of their ability to mine the coal on Parcel 55, and that the deprivation was the direct and necessary consequence of PennDOT's actions. (C.L. Nos. 91-92.) The trial court concluded that by virtue of the Shaffer Lease, PBS Coals had a right-of-way access from Parcel 55 to Mud Pike Road via Parcels 56 and 59, because the lease contemplated the inclusion of the three parcels in a multiple-property mine permit. (C.L. No. 93.) Although the trial court admitted that the Shaffer Lease did not explicitly grant PBS Coals the right to carry coal from Parcel 55 across Parcel 59, it concluded that the lease permitted the same because Exhibit A to the lease depicted a "Proposed Haul Road Location" and an "affected area" of the lease, which encompassed multiple surface mine pits across several properties. (C.L. No. 94.)

The trial court also determined that it was required to inquire into the likelihood that DEP would issue a mining permit for Parcel 55. (C.L. No. 96.) The trial court observed that the Coal Companies' experts' opinions were predominantly based on their experience in their respective fields, rather than the specific underlying facts for which the property would be scrutinized by DEP. *Id.* The trial court noted that the Tim Kania note failed to offer much encouragement for the permitting of a mine on Parcel 55 given DEP's negative experience with acid mine drainage from mining the same coal seam on the nearby Job 21, which had resulted in a "permanent treatment order." *Id.* Accordingly, the trial court held that the Coal Companies' "ability to obtain a surface mining permit" for Parcel 55 was "speculative and uncertain and . . . incapable of supporting a claim of taking of a property right" by PennDOT due to the location of Route 219. (C.L. No. 97.) Thus, the trial court concluded that a *de*

*facto* taking had not occurred and sustained the preliminary objections. (Trial court order, January 19, 2018.)[2]

## Discussion

On appeal,[3] the Coal Companies raise the following three issues: (1) the trial court erred in determining that alternative access via Parcel 59 was available to the Coal Companies to mine the coal underlying Parcel 55; (2) the trial court erred in deciding at the preliminary objections stage that the coal underlying Parcel 55 was not mineable because it was unlikely to be permitted by DEP, where such questions should have been decided by the board of viewers during the valuation stage; and (3) the record lacked substantial evidence to support the trial court's conclusion that the Coal Companies' ability to obtain approval from DEP for a surface mining permit for Parcel 55 was speculative and uncertain.

---

[2] The trial court also issued an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a). In the opinion, the trial court explained that the Shaffer Lease provided the Coal Companies alternative access to Parcel 55. (Trial court 1925(a) op. at 1-2.) Moreover, the trial court clarified that PennDOT had not proffered evidence that it had offered to construct a temporary bridge for the Coal Companies and that the trial court had not made a conclusion regarding whether the Coal Companies could obtain an HOP for the right-of-way from Parcel 55 across Parcels 50 and 54 to Garrett Shortcut Road. *Id.* The trial court also noted that its conclusions that the Coal Companies had not studied stream and wetland impacts or performed an overburden analysis for Parcel 55 had been erroneous, but that the Coal Companies had still not demonstrated that they would be able to obtain a mining permit because the environmental requirements for the already granted surface component of the nearby A-seam deep mine were less stringent than the requirements for a surface mine on Parcel 55. *Id.* at 3.

[3] "Our scope of review of a trial court's dismissal of preliminary objections to a petition for appointment of a board of viewers is limited to determining whether the trial court's findings are supported by competent evidence in the record, whether the trial court abused its discretion or whether it committed an error of law." *In re Condemnation by Department of Transportation, Of Right-of-Way for State Route 0079, Section 290, A Limited Access Highway in Township of Cranberry*, 805 A.2d 59, 63 n.3 (Pa. Cmwlth. 2002).

Initially, we note that in *de facto* taking cases "[a]n owner of a property interest who asserts that the owner's property interest has been condemned without the filing of a declaration of taking may file a petition for the appointment of viewers . . . ." Section 502 of the Eminent Domain Code, 26 Pa.C.S. §502(c). The trial court shall then "determine whether a condemnation has occurred, and, if the court determines that a condemnation has occurred, the court shall determine the condemnation date and the extent and nature of any property interest condemned." *Id*. "Preliminary objections are the exclusive method under the Code of raising objections to a petition for the appointment of a board of viewers alleging a *de facto* taking." *Genter v. Blair County Convention and Sports Facilities Authority*, 805 A.2d 51, 55 n.6 (Pa. Cmwlth. 2002). Once the trial court has determined that a *de facto* taking has occurred, it shall appoint a board of viewers to determine the just compensation damages to be awarded the property owner. *See* Sections 502, 504, and 701 of the Eminent Domain Code, 26 Pa.C.S. §§502, 504, 701.

In general, "the right of access to and from a public highway is a property right of which the owner of the property abutting the highway cannot be deprived without just compensation." *Wolf v. Department of Highways*, 220 A.2d 868, 817 (Pa. 1966). "Where land is taken or purchased for highways, the abutting owner retains, as an incident to ownership of the remainder of his land, the right of access, or of ingress and egress. This right cannot be taken from him unless compensation is made therefor under the law." *Id*; *see also McElwee v. Southeastern Pennsylvania Transportation Authority*, 948 A.2d 762, 775-76 (Pa. 2008) (concluding that every property owner retains the right of access from a public highway, which includes the right to *reasonable* ingress and egress); *York Road Realty Co., L.P. v. Cheltenham Township*, 136 A.3d 1047, 1054 (Pa. Cmwlth. 2016) (same). Further, we have held that a *de facto* taking occurs when the construction of a highway results in a landowner's property becoming landlocked. *See In re Condemnation by Department of Transportation, of*

10

*Right of Way for State Route 0079, Section W10*, 727 A.2d 618, 624 (Pa. Cmwlth. 1999).

## A. Whether Alternative Access was Available for Parcel 55

We first address whether the trial court erred in concluding that alternative access was available to the Coal Companies to mine Parcel 55. The Coal Companies argue that it is settled law in Pennsylvania that loss of access to one's property caused by a governmental entity is compensable as a *de facto* taking.[4] They assert that the construction of Route 219 severed the existing right-of-way for Parcel 55, across Parcels 50 and 54, and that the loss of the right-of-way resulted in a *de facto* taking of all of Parcel 55. The Coal Companies contend that the trial court erred in concluding the Shaffer Lease provided the Coal Companies alternative access to Parcel 55 by granting them the right to access the coal underlying Parcel 55 via the surface of Parcel 59 and Mud Pike Road. The Coal Companies maintain that under the plain language of the Shaffer Lease they did not enjoy a right-of-way across the surface of Parcel 59 for Parcel 55. In contrast, PennDOT argues that the Shaffer Lease and its attached exhibit provided the Coal Companies the right to transport coal from Parcel 55 across Parcel 59 to Mud Pike Road.

## 1. Relevant Principles of Contract Law

---

[4] The Coal Companies also argue that the trial court erred in concluding that Parcel 55 previously did not enjoy a right-of-way over Parcels 50 and 54; that PennDOT offered to construct a temporary bridge for the Coal Companies over Route 219, which would obviate any loss of access; and that the Coal Companies could not have obtained an HOP for the right-of-way over Parcels 50 and 54. Because the trial court concluded that the Coal Companies previously did enjoy a right-of-way over Parcels 50 and 54, that PennDOT did not produce evidence that it offered to construct a temporary bridge, and that it was not making a determination regarding an HOP, we do not address these issues. (C.L. Nos. 87-88; Trial court 1925(a) op. at 1-2.)

11

It is well-established that "the interpretation of any contract is a question of law and this Court's scope of review is plenary." *Southwestern Energy Production Co. v. Forest Resources, LLC*, 83 A.3d 177, 187 (Pa. Super. 2013). Thus, "we need not defer to the conclusions of the trial court and are free to draw our own inferences." *Id.*

"[A] lease is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). Therefore, "it must be construed in accordance with the terms of the agreement as manifestly expressed, and the accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *Id.* (internal quotation marks omitted); *see also Southwestern Energy Production*, 83 A.3d at 187 ("In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement."). Moreover, "[i]t is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). "[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed." *Id.* (internal quotation marks omitted).

Further, "[w]here the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence." *Id.* Accordingly, "where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Id.*; *see also Southwestern Energy Production*, 83 A.3d at 187 ("When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. The Court must construe the contract only

12

as written and may not modify the plain meaning under the guise of interpretation."). Where an agreement contains an integration clause and there is no apparent ambiguity or vagueness in the language of a lease, parol evidence is inadmissible to explain or vary the terms of the agreement. *Humberston v. Chevron U.S.A., Inc.*, 75 A.3d 504, 512 (Pa. Super. 2013).

## 2. Relevant Principles of Mineral Rights Law

Several basic and long-standing principles of coal and mineral rights are also instructive for this case. First, it is axiomatic that "one who has the exclusive right to mine coal upon a tract of land has the right of possession even as against the owner of the soil so far as it is necessary to carry on his mining operations." *Baker v. Pittsburg, C. & W. R. Co.*, 68 A. 1014, 1015 (Pa. 1908). "A grant of minerals implies the right to win them from the underlying soil" and "[t]he use of some portion of the surface is necessary for the proper enjoyment of this right." *Id.* at 1015-16. Since accessing the minerals requires a miner to "pass from the surface downward," the miner is granted "a right of way of necessity," which allows it to "sink through such land from the surface to the mines in order to reach and work them." *Id.* at 1016. Thus, "[a]n express grant of all the minerals and mining rights in a tract of land is by natural implication the grant also of the right to open and work the mines, and to occupy for those purposes as much of the surface as may be reasonably necessary." *Id.* Similarly, in *Chartiers Block Coal Co. v. Mellon*, 25 A. 597 (Pa. 1893), our Supreme Court noted that "[a]s against the owner of the surface," the owner of the coal estate has

> the right, without any express words of grant for that purpose, to go upon the surface to open a way by shaft, or drift, or well, to his underlying estate, and to occupy so much of the surface beyond the limits of his shaft, drift, or well, as might be necessary to operate his estate, and to remove the product thereof.

13

*Id.* at 598; *see also Belden & Blake Corp. v. Department of Conservation and Natural Resources*, 969 A.2d 528, 532 (Pa. 2009) (holding that "[o]ne who has the exclusive right to mine coal upon a tract of land has the right of possession even as against the owner of the soil, so far as it is necessary to carry on mining operations" (internal quotation marks omitted)).

Consequently, under Pennsylvania law, an owner of coal rights has the implied right to use as much of the surface property as necessary for mining operations, but "what is necessary and reasonable may be determined by reference to what is customary, and is a question of fact." *Oberly v. H. C. Frick Coke Co.*, 104 A. 864, 864 (Pa. 1918). The right to use as much of the surface as necessary for mining operations, however, must "be exercised with due regard to the owner of the surface, and its exercise will be restrained within proper limits by a court of equity, if this becomes necessary." *Chartiers Block Coal Co.*, 25 A. at 598.

In general, "a grantee of coal in place, with license to mine and remove it, in the absence of express stipulation, may, at any time, **before the coal is all removed**, use the **passage opened for its removal** for the transportation of coal from his adjoining lands." *Westerman v. Pennsylvania Salt Manufacturing Co*., 103 A. 539, 541 (Pa. 1918) (emphasis added). Therefore, where

> the coal has not been exhausted or the estate abandoned, the space left by the removal of the coal belongs to the owner of the coal [and] . . . until that estate is terminated by the exhaustion of the coal, or lost by abandonment, the vendee is entitled to the possession of the coal, **and also of the space made by its removal, and may use such space in transporting coal from other lands**.

*Kormuth v. United States Steel Co.*, 108 A.2d 907, 909 (Pa. 1954) (emphasis in original); *see also Lillibridge v. Lackawanna Coal Co.*, 22 A. 1035, 1038 (Pa. 1891) (concluding that if an owner of coal desires to use the passageways created by his

14

previous mining of the enclosed minerals of the coal estate "as a thoroughfare for the carriage of minerals gotten out of his adjoining land" instead of mining the remaining minerals on the estate, "he is entitled to do so").

However, this "rule is different in the case of a right of way **upon** the **surface of land**, which is incorporeal and can be used **only** for the purpose specified in the grant." *Westerman*, 103 A. at 541 (emphasis added). Thus, "[w]here a vendor of the surface reserves the coal, with no stipulation as to the mining thereof, he will be entitled to such use of the surface as is necessary to make his reservation effective . . . ; but, **if he owns adjoining property**, through or over which it is practically possible to mine and remove the reserved coal, he will not be entitled to use for that purpose **the conveyed surface**." *Friedline v. Hoffman*, 115 A. 845, 846 (Pa. 1922) (emphasis added). This is because "[a] way of access to property granted or reserved will be implied only when necessary to give effect to the grant or reservation." *Id.*; *see also Weisfield v. Beale*, 79 A. 878, 879 (Pa. 1911) (holding that when grantee bought the coal under a certain tract of land he could haul coal from other tracts through the mine passageways under the land because they were his property, but that he had no right to "the use of the surface of the land for transporting coal from another tract" because the grantee's right to use of the surface of the tract was limited to transporting the coal from underneath that tract); *Vogel v. Webber*, 28 A. 226, 227 (Pa. 1893) (concluding that use of the surface of property was restricted to transporting coal from underneath that particular property and that there was no implied right to transport coal mined from beneath other properties on the surface of said property). Accordingly, "**[s]urface rights** . . . may be used for the purpose only of mining **under the premises conveyed**, and not as a means of removing minerals from other lands." *Oberly*, 104 A. at 864 (emphasis added). Of course, the limitation on surface rights may "be changed by the terms of the contract." *Id.*

15

Similarly, in *Shawville Coal Co. v. Menard*, 421 A.2d 1099 (Pa. Super. 1980), the Superior Court noted that "a grantor's conveyance of the right to use the surface of his land to transport other coal owned by the grantee is **entirely separable from** any accompanying grant to mine the coal under the tract itself." *Id.* at 1104 (emphasis added). The court explained that although "[s]everal Pennsylvania cases suggest that where a party is granted the right to mine coal under a property it also has an implicit if not explicit right to move other coal owned by it **through the passageways under the property while the coal is being mined**," this precept was "not applicable to the transportation **on the surface of other coal owned by the grantee**." *Id.* at 1104 n.4 (emphasis added). Thus, the court determined that "[a]ny additional use of the surface beyond that needed to mine the coal under the land itself imposes an encumbrance that will not be **implied unless explicitly made a part of the agreement between the parties**." *Id.* (emphasis added).

Ordinarily, when a property owner grants the right to another to remove minerals beneath the surface, "he receives 'rents or royalties'[, but] when he permits minerals from adjoining lands to be transported over the surface of his own lands, he receives 'wheelage' for the privilege granted." *Robinson v. Stover*, 182 A. 145, 146 (Pa. 1936). Hence, "[t]he consideration in the first instance is the marketing of his minerals, but in the latter case, **as he has no interest in the removal of such foreign minerals**, the consideration is the hindrance to his full enjoyment of the surface of his lands." *Id.* (emphasis added); *see also Shawville Coal Co.*, 421 A.2d at 1104 (same). Thus, the grant of wheelage rights for the transportation of coal from adjoining lands evidences an intention to permit the same. *See id.*

**3. The Shaffer Lease**

16

Here, the Shaffer Lease for Parcel 59 provides, in pertinent part, as follows:

THIS AGREEMENT, entered into the 24th day of July, 2006, (herein after referred to herein as "Agreement") by and between, Jean C. Shaffer . . . hereinafter referred to as "Lessor", and PBS Coals, Inc., a Delaware corporation . . . hereinafter called "Lessee."

### WITNESSETH:

WHEREAS, the Lessor is the owner of a 100% interest in certain surface tracts located in Brothersvalley Township, Somerset County, Pennsylvania, together with the mining rights applicable thereto, which is more specifically described in Exhibit "A" (hereinafter the "Premises"); and

. . .

1. **Lease.**  The Lessor does hereby demise, lease and let unto Lessee, and Lessee does hereby lease from Lessor, under the terms and rentals and upon the covenants, conditions and agreements hereinafter contained, all of the surface tracts which can be mined and coal removed by the deep, strip, auger or highwall mining methods, together with all mining rights and privileges applicable to the coal herein demised as are vested in Lessor or as may be hereafter acquired.  In addition, **Lessor agrees to execute and sign any documents required to be signed by Lessor, as requested by Lessee, in connection with obtaining or maintaining a mining permit on the Premises**, including but not limited to, a land owner consent form.

2. **Term.**  The term of this Lease shall commence as of the date above and shall continue in full force and effect for a period of seven (7) years and so long thereafter as active mining is being conducted on the Premises or on a mine which has or will include the Premises.  In the event all of the mineable and merchantable coal herein demised shall have been fully mined and recovered from the Premises, and no other conditions exist that would entitle Lessee to continue this Lease, this Lease shall terminate.

17

. . .

3. **Royalties**

. . .

(C). Deep Mine Wheelage: In the event Lessee opens a deep mine on the Premises and coal is mined and removed by the deep mining method from the aforesaid Premises, the Lessee agrees to pay the Lessor a Wheelage Royalty of TEN CENTS ($0.10) per raw ton of 2,000 pounds, for all mineable and merchantable coal which is mined and removed from the deep mine opening. . . .

. . .

15. **Final Agreement: No Oral Modification.** This Lease is the final, integrated agreement of the parties and sets forth all of the terms, covenants, conditions, or provisions agreed upon by the parties hereto, and there are no conditions, or provisions with respect to the coal demised hereunder or with respect to the coal rights or any other rights or privileges appertaining thereto, other than those set forth in this Lease.
. . .

(Shaffer Lease, S.R.R. at 60b-62b, 68b-69b) (emphasis added). In addition, Exhibit "A" to the Shaffer Lease shows the Shaffers' property, *i.e.*, Parcel 59, with a "Proposed Haul Road Location" leading to Mud Pike Road on the northern portion of the parcel. (Shaffer Lease, Exhibit "A," S.R.R. at 71b.) Exhibit "A" also identifies a shaded "Area to be Affected" by the mine and a "Proposed Augering Area" of the mine; neither of the shaded parcels appear to include Parcel 55. *Id.*

**4. The Parties' Arguments**

18

The Coal Companies argue that the trial court erred in construing the language of Paragraph 1 of the Shaffer Lease, which requires the Shaffers to execute any necessary documents, as granting the Coal Companies a right to access the coal underlying Parcel 55 via the surface of Parcel 59. The Coal Companies contend that Paragraph 1 did not grant PBS Coals any rights beyond the geographic limitations of the Shaffer property. They similarly argue that the trial court erred in concluding that Paragraphs 2 and 3(C) grant PBS Coals the right to use the surface of Parcel 59 to access Parcel 55. The Coal Companies further argue that under the integration clause in Paragraph 15, parol evidence was inadmissible and, therefore, the trial court erred in relying on the same to interpret the lease. Additionally, the Coal Companies assert that Exhibit "A" does not provide support for the trial court's interpretation because both the "haul road" and "area to be affected" are exclusively within the Shaffer Property, *i.e.*, Parcel 59. In sum, the Coal Companies assert that because the Shaffer Lease did not grant them alternative access to Parcel 55, a *de facto* taking of Parcel 55 occurred.

Conversely, PennDOT contends that Exhibit "A" supports the trial court's interpretation because it depicts a proposed surface mine that includes Parcels 59, 56, and 55 with a haul road leading to Mud Pike Road and, therefore, PBS Coals can use a right-of-way on Parcel 59 to access Parcel 55. PennDOT also argues that because Paragraph 1 grants PBS Coals the right to mine all the coal from Parcel 59 along with any "mining rights and privileges applicable to the coal . . . or as may be hereafter acquired" and requires the Shaffers to execute any documents required for a mining permit, the Shaffers must allow PBS Coals the right to access Parcel 55. Specifically, because rights-of-way are required for DEP surface mining permits and a single mining permit would have been issued for a multi-parcel mine, PennDOT alleges that PBS Coals has the right to access a mine on Parcel 55 from Parcel 59. (Shaffer Lease, S.R.R. at 60b.) PennDOT claims that because the lack of access to remove coal from Parcel

19

55 would negate PBS Coals' ability to obtain a permit for the whole project, the Shaffers are required to permit PBS Coals to access Parcel 55 via Parcel 59.

PennDOT similarly claims that Paragraph 2 grants PBS Coals the right to access Parcel 55 from Parcel 59 because it gives PBS Coals the right to conduct active mining "on the Premises or on a mine which has or will include the Premises." (Shaffer Lease, S.R.R. at 61b.) PennDOT asserts that this language contemplates a multi-parcel mine and that the lease remains active so long as PBS Coals continues to mine any of the parcels. Because the Shaffer Lease grants alternative access to Parcel 55 from Parcel 59, PennDOT argues that the Coal Companies have not demonstrated that PennDOT's conduct resulted in a *de facto* taking.

## 5. Analysis

Here, the plain language of the Shaffer Lease does not manifest an intention to permit the Coal Companies to access Parcel 55 by way of the surface of Parcel 59. First, there is no express language in the lease granting PBS Coals the right to use the surface of Parcel 59 to access Parcel 55 or cross-referencing the lease for Parcel 55. Second, the language in the lease relied on by the trial court does not establish that the parties intended to allow PBS Coals to access Parcel 55 from the surface of Parcel 59.

For example, while Paragraph 1 of the Shaffer Lease, the grant clause, requires the Shaffers to sign any documents requested by PBS Coals in connection with maintaining a mining permit, there is no language in Paragraph 1 explaining that PBS Coals intended to construct a mine on multiple parcels of property and/or that the Shaffers must permit PBS Coals to access other parcels of property from the surface of Parcel 59 as part of the construction of a multi-parcel mine. Similarly, although the trial court relied on the language in Paragraph 2, which provides that the term of the lease is "seven (7) years and so long thereafter as mining is being conducted on the

20

Premises or on a mine which has or will include the Premises,"[5] this language does not explicitly demonstrate that PBS Coals intended to build a multi-parcel mine or that PBS Coals was entitled to access other parcels of property from the surface of Parcel 59. (Shaffer Lease, S.R.R. at 61b.) Merely because Paragraph 2 extends the term of the lease as long as mining is conducted on a mine including the Premises does not establish that the parties intended to grant or otherwise allow PBS Coals to access other parcels from the surface of Parcel 59. Further, while the trial court relied on Paragraph 2 in support of its conclusion, Paragraph 2 only sets the **term** of the lease; in contrast, Paragraph 1, the **grant clause**, is completely silent with respect to whether the Shaffers intended to grant PBS Coals the right to use the surface of Parcel 59 to transport coal from other properties.

Likewise, Paragraph 3(C) of the Shaffer Lease does not support the trial court's holding. Under Paragraph 3(C), in the event PBS Coals opened a deep mine on the Premises, it agreed to pay the Shaffers for "all mineable and merchantable coal . . . mined and removed from the deep mine opening," meaning the Shaffers would receive compensation for coal from other parcels that is removed from the **deep mine** opening on their property. (S.R.R. at 62b.) However, PBS Coals envisioned a surface mine, rather than a deep mine for Parcel 55, *see* F.F. Nos. 67-69, 78-79; R.R. at 37a, and the fact that PBS Coals agreed to pay the Shaffers wheelage for coal removed from a deep mine on Parcel 59 does not provide an express indication that the parties either intended a multi-parcel mine or that PBS Coals could access other parcels from the surface of Parcel 59.

Moreover, Paragraph 3(C) provides no royalties or wheelage to the Shaffers for any coal removed from a surface mine on Parcel 55 **that traverses the**

---

[5] The term "Premises" in the lease is described as the property owned by the Shaffers and also shown in Exhibit "A." (S.R.R. at 60b, 71b.)

21

**surface of Parcel 59**. As discussed in the *Robinson* and *Shawville Coal Co.* cases, in general, where a surface landowner grants the owner of the coal estate the right to transport minerals from adjoining properties **over the surface of the property**, the surface landowner receives wheelage as consideration. Although the grant of wheelage to the Shaffers for the use of the surface of Parcel 59 to remove coal from other tracts would provide strong evidence that the parties intended to allow the Coal Companies to use the surface for the same, the Shaffer Lease does not provide wheelage for such use. Accordingly, the absence of any grant of wheelage to the Shaffers for the use of the surface of their property indicates that the parties did not intend to permit the same.

While the language in Paragraphs 2 and 3 of the Shaffer Lease extending the term of the lease as long as mining is being conducted on a mine including the premises and granting the Shaffers wheelage for coal removed from a **deep mine opening** could, potentially, be construed as establishing an intention to construct a multi-parcel **deep mine**, the lease undoubtedly does not exhibit an intention to allow PBS Coals to access a separate **surface mine** on Parcel 55 via the surface of Parcel 59. Because the coal underlying Parcel 55 is too shallow for a deep mine, the Coal Companies did not intend to access the coal under Parcel 55 through the use of a deep mine. (R.R. at 37a.) Instead, the Coal Companies planned on constructing a separate surface mine on Parcel 55, *id.*, and thus would have been required to access the coal on Parcel 55 by way of the surface of Parcel 59. However, the Shaffer Lease contains no explicit language granting the Coal Companies the right to use the surface of Parcel 59 to access a separate surface mine on Parcel 55. Additionally, as discussed previously, the right to access other properties from a deep mine opening is very different and separable from the right to use the surface of a property to access other properties. *See Friedline*, 115 A. at 846; *Oberly*, 104 A. at 864; *Westerman*, 103 A. at 541; *Weisfield*, 79 A. at 879. Although the right to access adjoining properties by way of the tunnels and passageways of a deep mine may be implied, there is no such implication with

22

regard to accessing adjoining properties by way of the surface.[6] *See Friedline*, 115 A. at 846; *Oberly*, 104 A. at 864; *Westerman*, 103 A. at 541; *Weisfield*, 79 A. at 879.

Finally, Exhibit "A" to the Shaffer Lease, which the trial court also relied on, does not support the trial court's conclusion. On Exhibit "A," Parcel 55 is depicted on the lower-most portion of the exhibit. The proposed haul road leading from Mud Pike Road that is shown on the exhibit is exclusively within Parcel 59 and does not reach any other parcels, including Parcel 55.[7] Further, the "area to be affected" by the mine that is depicted on Exhibit "A" appears exclusively within Parcel 59, and does not encompass Parcel 55. Additionally, although the "proposed augering area" on Exhibit "A" appears to cover Parcel 59 and at least one additional parcel, it does not include Parcel 55. Because the proposed haul road and affected area of the mine are not shown on Exhibit "A" as cutting across or including Parcel 55, contrary to the trial court opinion Exhibit "A" does not demonstrate that the parties intended to permit PBS Coals to access Parcel 55 by way of the surface of Parcel 59.

In short, because there is no explicit language in the Shaffer Lease that provides the Coal Companies a right-of-way across the surface of Parcel 59 to access Parcel 55, the trial court erred in concluding that the Shaffer Lease gave the Coal Companies alternative access to Parcel 55. As our Supreme Court has repeatedly held, while the owner of a coal estate has the right to use the tunnels and passageways

---

[6] The trial court relied on PBS Coals' internal "Mining Plan," which allegedly showed one mining operation spanning multiple parcels, including Parcels 59, 56, and 55, in support of its conclusion that the Shaffer Lease granted the Coal Companies the right to access Parcel 55 from the surface of Parcel 59. Yet, because there is no apparent ambiguity in the Shaffer Lease regarding the use of the surface of Parcel 59 to access Parcel 55, and the lease contains an integration clause, the trial court erred to the extent it relied on parol evidence to interpret that portion of the lease. *See Humberston*, 75 A.3d at 512.

[7] While Exhibit "A" to the Shaffer Lease suggests that Parcels 55 and 59 are adjacent to each other, several of the trial court exhibits demonstrate otherwise. *See, e.g.*, R.R. at 130a, 133a, 139a-140a. Thus, to access Parcel 55 from Parcel 59, PBS Coals would have had to traverse Parcel 56. *Id.*

underlying the surface to transport coal from adjoining properties, as long as all the coal has not yet been removed, it has no implied right to use the **surface** to transport coal from adjoining properties. *See Friedline*, 115 A. at 846; *Oberly*, 104 A. at 864; *Westerman*, 103 A. at 541; *Weisfield*, 79 A. at 879. Thus, "[a]ny additional use of the surface beyond that needed to mine the coal under the land itself imposes an encumbrance that will not be implied unless explicitly made a part of the agreement between the parties." *Shawville Coal Co.*, 421 A.2d at 1104 n.4. Here, there is no explicit language in the Shaffer Lease granting PBS Coals the right to use the surface of Parcel 59 to transport coal from either adjoining lands, or non-adjoining lands, such as Parcel 55. Due to the lack of explicit language, we must conclude that the parties did not intend to grant PBS Coals the right to transport coal from other properties across the surface of Parcel 59. Consequently, the trial court erred in concluding (1) the Shaffer Lease gave the Coal Companies alternative access to Parcel 55 via Parcel 59; and (2) that Parcel 55 was not landlocked because of PennDOT's actions.

## B. Whether the Trial Court Erred in Assessing the Mineability of Parcel 55
### 1. The Parties' Arguments

Next, the Coal Companies argue that the trial court erred in deciding at the preliminary objections stage that the coal underlying Parcel 55 was not mineable, because it was unlikely to be permitted by DEP, where such questions should have been decided by the board of viewers during the valuation stage. The Coal Companies contend that under the Eminent Domain Code,[8] where a party alleges a *de facto* taking has occurred and files a petition for appointment of a board of viewers, the sole issues before the trial court are whether or not a taking has occurred and, if so, the extent and date of the taking. After the trial court makes this threshold determination, the matter

---

[8] 26 Pa.C.S. §§101-1106.

24

proceeds to the board of viewers, which determines the amount of damages. The Coal Companies maintain that the trial court erred by analyzing whether the coal underlying Parcel 55 was capable of being mined because such questions should have been left to the board of viewers to decide at the damages stage.

The Coal Companies also claim that the trial court erred in relying on *Parker Avenue, L.P. v. City of Philadelphia*, 122 A.3d 483 (Pa. Cmwlth. 2015), and *In re Borough of Blakely*, 25 A.3d 458 (Pa. Cmwlth. 2011). According to the Coal Companies, these cases involved whether a *de facto* taking was "speculative and conjectural," *i.e.*, whether a taking was or was not likely to occur at some point in the future, as opposed to the instant case where it is beyond question that a taking has occurred, due to the loss of access to Parcel 55. The Coal Companies argue that the trial court erred by conflating a "speculative and conjectural" *de facto* taking, with the Coal Companies' supposed "speculative" ability to obtain a mining permit. The Coal Companies contend that a *de facto* taking has occurred because their inability to mine Parcel 55 is the direct and necessary adverse effect caused solely by the construction of Route 219. The Coal Companies also argue that the trial court erred in relying on *Lehigh-Northampton Airport Authority v. Fuller*, 862 A.2d 159 (Pa. 2004), and *Condemnation of 23.015 Acres More or Less Known as Tax Map (Showalter)*, 895 A.2d 76 (Pa. Cmwlth. 2006), because those cases concerned the valuation of condemned properties, rather than the threshold question of whether a *de facto* taking had occurred, which is decided at the preliminary objections stage.

In contrast, PennDOT contends that under our case law, a *de facto* taking occurs only when the property owner demonstrates that there are exceptional circumstances that substantially deprive the property owner of the beneficial use and enjoyment of the property and that the deprivation is the immediate, necessary, and unavoidable consequence of the exercise of the eminent domain power. PennDOT argues that where a *de facto* taking claim is based on a use that is speculative and

25

conjectural, eminent domain law does not provide relief. PennDOT claims that in order to determine whether a *de facto* taking occurred, the trial court was required to inquire into whether the Coal Companies had been substantially deprived of their beneficial use of a property interest, which placed at issue their ability to exploit the mineral estate underlying Parcel 55. Because the Coal Companies never filed any permit applications for a surface mine on Parcel 55 and failed to perform the necessary preliminary research, the trial court properly concluded that any deprivation of a beneficial use in the property was too speculative to constitute a *de facto* taking.

PennDOT contends that the instant case is analogous to *Parker Avenue* and *In re Petition of 1301 Filbert Ltd. Partnership for Appointment of Viewers*, 441 A.2d 1345 (Pa. Cmwlth. 1982), where we determined that any potential deprivation of use was too speculative to constitute a *de facto* taking. Because the Coal Companies never applied for environmental permits from DEP, and the issuance of any hypothetical permits was merely speculative, PennDOT argues that the Coal Companies' inability to mine the parcels was not the direct and immediate consequence of PennDOT's severing of the Parcel 55 right-of-way that resulted from the construction of Route 219. According to PennDOT, the Coal Companies cannot be deprived of a use when that use was not permitted in the first place.

## 2. *De Facto* Taking Requirements

We have previously held that "[a] *de facto* condemnation occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the beneficial use and enjoyment of his property." *In re Condemnation by Department of Transportation, of Right-of-Way for State Route 0079, Section 290, A Limited Access Highway in Township of Cranberry (Norberry One Condominium Association)*, 805 A.2d 59, 68 (Pa. Cmwlth. 2002). Further, there are three elements that a property

26

owner must demonstrate to establish a *de facto* taking. *Id.* "First, the condemnor must have the power to condemn the property. Second the property owner must establish that there are *exceptional circumstances* that substantially deprive the property owner of the beneficial use and enjoyment of the property." *Id.* (emphasis in original) (internal citation omitted). Finally, "the property owner must demonstrate that the deprivation is the immediate, necessary and unavoidable consequence of the exercise of the power to condemn." *Id.* "In a claim of a *de facto* taking, the property owner bears a heavy burden of proof, and each case turns on its unique factual matrix." *Genter*, 805 A.2d at 56.

"A *de facto* taking is not a physical seizure of property; rather, it is an interference with one of the rights of ownership that substantially deprives the owner of the beneficial use of his property." *In re Borough of Blakely*, 25 A.3d at 463. "The beneficial use of a property includes not only its present use but all potential uses including its highest and best use." *Gaughen v. Department of Transportation*, 554 A.2d 1008, 1015 (Pa. Cmwlth. 1989). The burden is on the property owner to prove "that the property is adaptable for a use other than its current use and that there is need for this other use." *Id.*

### 3. Speculative and Conjectural *De Facto* Taking Cases

We have previously held that "where '[t]he case . . . is one in which the claim of *de facto* taking is not only prospective but is also *speculative and conjectural* . . . our law of eminent domain does not in its present posture, provide relief.'" *Parker Avenue*, 122 A.3d at 491 (emphasis added) (quoting *In re Borough of Blakely*, 25 A.3d at 467). For example, in *1301 Filbert*, 441 A.2d at 1346, the property owner filed a petition for appointment of a board of viewers alleging that the City of Philadelphia's (City) activities regarding a commuter tunnel project had resulted in a *de facto* taking of the property owner's hotel. Prior to the tunnel project, a partnership purchased the

hotel, which had been closed for several years and was in a state of disrepair, with the intention of renovating and reopening the hotel. *Id.* at 1348. The renovations ran into significant problems including costs vastly exceeding the original estimates and contractor work stoppages due to the partnership being delinquent in its payments. *Id.* Eventually the partners sought outside financing to complete the project; however, several prospective lenders backed out because they were allegedly concerned that the City's construction of the commuter tunnel would interrupt the operation of the hotel and that, therefore, the hotel would not be successful. *Id.* at 1350. Thereafter, the partnership defaulted on its existing loans. *Id.* Although construction had not commenced at the time the outside financing was withdrawn, the construction of the tunnel was estimated to last four years and the area directly in front of the hotel was expected to be turned into a giant pit that measured 38-feet-wide and 44-feet-deep. *Id.* at 1351.

In its *de facto* taking claim, the property owner attempted to demonstrate that the hotel would have been successful but because of the tunnel project, patrons would have refused to stay at the hotel, lenders would have refused to finance the hotel, and if the hotel had opened, its business would have been unable to survive four years of construction work in front of the hotel. *Id.* at 1360. The trial court "rejected as being doubtful, speculative and conjectural" that the tunnel construction activity would deprive the hotel of the business "it would need to survive even if the hotel were able to open its doors for business during the progress of the [t]unnel work." *Id.* at 1360. We agreed, concluding that the *de facto* taking claim was "linked to an *alleged injury* that [was] not only prospective but [was] also speculative and conjectural." *Id.* (emphasis added). In affirming the trial court, we also determined that the tunnel construction had not deprived the property owners of their *access* to the hotel. *Id.*

In *Borough of Blakely*, 25 A.3d at 460, a property owner alleged that a *de facto* taking occurred when the Borough of Blakely installed a PVC drainage pipe

28

across its property, which allegedly cut off vehicular access to a nearby road. The property owner alleged that the loss of access prevented him from building residential homes on his property; however, he never spoke to an architect about developing plans for the buildings, never presented any plans to the borough planning commission, and never talked to anyone about obtaining any zoning permits, even though a dimensional variance was needed *Id.* at 465-66. We concluded that the trial court had correctly dismissed the *de facto* taking claim because (1) the borough never told the owner that he could not build the homes; (2) the owner did not consult the planning commission or submit any plans to the borough; (3) the owner did not investigate what storm water improvements would be needed to build homes; (4) the owner did not explain why the pipe could not be replaced; (5) the owner did not explain why **access** was not possible from another road abutting the property; (6) the owner did not explain how he would obtain the necessary variances; and (7) the owner did not explain why he waited so long to bring his claim. *Id.* Thus, we held that the owner's "claims of injury and substantial deprivation of the use of his property [were] speculative and conjectural." *Id.* at 467.

Finally, in *Parker Avenue*, 122 A.3d at 485, a property owner purchased a property in Philadelphia with the intention of building 48 single-family detached homes. Because the property was adjacent to an unimproved "paper street," the property owner submitted two proposed ordinances to permit the paving of the paper street and to revise the street's lines and grades so that it would be capped by a cul-de-sac. *Id.* After the ordinances were rejected by the Philadelphia City Council, the property owner filed a petition for appointment of a board of viewers alleging that it had suffered a *de facto* condemnation of the entire property, and the trial court agreed. *Id.* at 487.

The City appealed, arguing that its alleged inaction in not enacting the ordinances authorizing paving to provide **access** to the property did not give rise to a

29

*de facto* taking and that the alleged deprivation of use was too speculative to be a taking. *Id.* at 487, 490. In contrast, the property owner maintained it had been substantially deprived of the use and enjoyment of its property because the City's conduct resulted in its inability to proceed with developing its property, and that the deprivation of its beneficial use and enjoyment of the property was not hypothetical because it paid a substantial sum for the property and invested significant time, money, and energy with architects, engineers, and attorneys to proceed with the development. *Id.* at 488, 491. We first determined that the property owner "purchased the [p]roperty knowing it was **landlocked** for the purposes of such development as no paved, legally-open [City] Zoning Code . . . compliant street provided access for such use" and knowing that it needed City Council's approval before developing the property. *Id.* at 489-90 (emphasis added). Because "nothing was 'taken' from [the property owner] that it had or legitimately expected to get," we concluded that the trial court erred in concluding a *de facto* taking had occurred. *Id.* at 491.

We also noted that when the property owner purchased the property it was aware that the project was a risky venture given the necessary approvals needed and the community resistance, and that even if the ordinances had passed, the property owner would have needed to gain the approval of the board of surveyors and planning commission. *Id.* at 491. Given the community's resistance we determined the board of surveyor's approval was speculative at best. *Id.* Because the passage of the ordinance was not assured and was not the only obstacle preventing the property owner from developing a residential subdivision on its property we concluded that the failure to approve the ordinances did not constitute an exceptional circumstance that deprived the owner of the beneficial use and enjoyment of its property. *Id.* We also determined that the property owner had not met its burden of demonstrating "that the alleged detriment, underlying the claim of *de facto* taking, was the direct and necessary consequence of the City's failure to pass a routine paving ordinance." *Id.* (internal

30

quotation marks omitted). Thus, in *Parker Avenue*, we held that the lower court "erred in concluding that developing a residential subdivision was the highest and best use of the [p]roperty as the record evidence established it was remote and speculative."[9] *Id.* at 491-92.

### 4. Analysis

The question of whether a trial court must determine whether a coal property is likely to be permitted by DEP when disposing of preliminary objections filed in response to a petition for appointment of a board of viewers does not appear to

---

[9] Two cases mentioned by the trial court also merit a brief discussion. In *Lehigh-Northampton Airport Authority*, 862 A.2d at 161, the Lehigh-Northampton Airport Authority filed a declaration of taking with respect to a property on which the property owner had sought to build a residential subdivision. However, at the time of the taking, none of the subdivision plans had been approved. *Id.* **After a board of viewers was appointed** and valued the property, both parties appealed to the trial court. *Id.* at 166. On appeal, the airport authority argued that the trial court erred in admitting evidence of the subdivision development approach to value the condemned property because the subdivision did not have municipal approval. However, we disagreed, concluding that the property owners "showed that the land was ripe for development, that their expectation of securing all of the necessary zoning and other required permits was reasonable, and that the development of the property was within the reasonably foreseeable future." *Id.* We also determined that evidence of the proposed subdivision plans was admissible to establish the property's highest and best use. *Id.* at 168.

Similarly, in *Showalter*, 895 A.2d at 80, the Pennridge School District filed a declaration of taking to condemn a property. The property owners petitioned for a board of viewers, and **after the board held a hearing and issued a report valuing the property**, the property owners appealed to the trial court. *Id.* The property owners argued that the best use of their property was a residential subdivision; however, the trial court did not permit evidence regarding the property's value as a subdivision because it concluded that the property owners had not taken meaningful steps to subdivide the property. *Id.* at 84-85. On appeal, we determined that the record revealed that the "best and most desirable use" for the property was as a residential development and that the planning authorities had been favorably disposed to permitting a subdivision of the property before it was condemned. *Id.* at 85. We concluded that it was not necessary for the property owners "to prove that all zoning and other permits had been finally secured" and that "they only had to demonstrate that their expectation for approval was reasonable, and that the development was within the reasonably foreseeable future." *Id.* Thus, we held the trial court had erred in not permitting the valuation evidence. *Id.*

Because both of these cases were valuation cases involving the compensation to be awarded following a condemnation determination, and did not involve the separate question of whether a *de facto* condemnation had occurred, these cases are somewhat inapposite to the present discussion.

31

have been ever addressed by this Court. However, the three cases discussed above, in which we determined that a taking had not occurred because the injury was "speculative and conjectural," are distinguishable from the instant case. For example, in *1301 Filbert*, the property owner argued that its hotel venture failed due to the construction of a commuter tunnel adjacent to the hotel; yet, the hotel never operated, it was unclear whether the hotel would have been successful, and there was evidence presented that the property owners failed to obtain outside financing because of mismanagement and cost overruns, instead of the tunnel construction. 441 A.2d at 1349-50, 1359-60. We concluded that the link between the tunnel project and the alleged **injuries** suffered by the property owners was too speculative and conjectural to constitute a taking and, also, that the project did not **deprive the property owners of access** to the hotel.

In *Borough of Blakely*, we concluded that the property owner's claims of injury and substantial deprivation of use were too speculative and conjectural because he did not take any actions to build residential homes on the property or obtain the necessary governmental approvals and, importantly for our case, did not explain why **access** to his property was not possible from another road. Similarly, in *Parker Avenue*, because the property owner understood that his business venture was risky and approval of the ordinances was far from certain, we concluded that the property owner did not demonstrate that his injury was the direct consequence of the City's actions.

These three cases all hinged, to a certain degree, on the causation prong of the *de facto* taking test, *i.e.*, whether the substantial deprivation of use was the "immediate, necessary and unavoidable consequence of the exercise of the power to condemn." *Norberry One Condominium Association*, 805 A.2d at 68. In all three cases, we determined that it was speculative and conjectural that the deprivation of use suffered by the property owners was the immediate and necessary consequence of the condemnation power. Moreover, in all three cases we took note of the fact that the

32

property owners had not been deprived of **access** to their properties by the alleged condemning entities. In both *Borough of Blakely* and *1301 Filbert*, we held that the property owners had not demonstrated a loss of access; whereas, in *Parker Avenue*, we held that the property owner purchased the property knowing it was landlocked and, thus, that the loss of access had not occurred because of the City's actions.

In contrast here, because the construction of Route 219 resulted in the Coal Companies' complete loss of access to Parcel 55, it is beyond question that the Coal Companies were deprived of the use of their property as a **direct and immediate consequence** of PennDOT's actions. Since under our precedent the loss of access will result in a *de facto* taking, *see McElwee*, 948 A.2d at 775-76, it would be irrational for us to conclude that a *de facto* taking did not occur because the Coal Companies did not prove that they were likely to obtain a mining permit for Parcel 55. Unlike the "speculative and conjectural" line of cases where the connection between the injuries and the condemning entities' actions was too remote, in the instant case the Coal Companies entered into mineral leases for Parcel 55, which made them the owners of the coal estate, *see Schuster v. Pennsylvania Turnpike Commission*, 149 A.2d 447, 454-55 (Pa. 1959), and were then deprived of all access to Parcel 55 by PennDOT's actions. As a result of the construction of Route 219, the right-of-way for Parcel 55 was severed and the property became landlocked; accordingly, we conclude that a *de facto* taking occurred.

This case is distinguishable from the speculative and conjectural line of cases in one further respect. In *Borough of Blakely*, *1301 Filbert*, and *Parker Avenue*, the property owners attempted to demonstrate that the highest and best use of the property was a use other than its present use at the time of the taking. Conversely, here, the *de facto* taking involves a coal estate, as evidenced by the coal lease regarding Parcel 55, and there is no dispute that coal exists underneath Parcel 55. Given these

facts, it would appear undeniable that the highest and best use of the coal estate for Parcel 55 is for mining coal.

Under the trial court and PennDOT's logic, the owners of a coal estate would never be able to demonstrate a *de facto* taking, at the preliminary objections stage, unless they were able to prove that they were likely to obtain a mining permit. However, such a result would place a higher burden of proof on owners of coal estates than owners of surface properties and would effectively relegate owners of coal estates to second class property owner status. This is because, for *de facto* taking cases, coal estate owners would not be able to prove that they suffered a substantial deprivation in the use and enjoyment of their property, at the preliminary objections stage, unless they could establish that DEP would issue a mining permit; unlike surface property owners who do not face any similar requirement to demonstrate a *de facto* taking at the preliminary objections stage, even if their property is relatively valueless or useless.

Pursuant to our precedent, because PennDOT's actions resulted in the Coal Companies' loss of access to Parcel 55 and the property becoming landlocked, we conclude that a *de facto* taking occurred. Thus, the trial court erred to the extent it required the Coal Companies to demonstrate that the coal was permittable and mineable at the preliminary objections stage and such questions should have been left to the board of viewers to determine at the damages/valuation stage.[10]

_____

[10] Because we determine that the trial court erred to the extent it examined whether Parcel 55 was mineable and/or permittable at the preliminary objections stage, it is unnecessary for us to address the Coal Companies' third issue raised on appeal, *i.e.*, whether the record lacked substantial evidence to support the trial court's conclusion that the Coal Companies' ability to obtain approval from DEP for a surface mining permit for Parcel 55 was too speculative and uncertain. Nevertheless, we wish to note that in *de facto* taking cases, "[s]ubstantial evidence is relevant evidence that a reasonable mind might consider adequate to support a conclusion." *Department of Transportation v. Agricultural Lands Condemnation Approval Board*, 5 A.3d 821, 830 (Pa. Cmwlth. 2010). In addition, "substantial evidence requires more than a scintilla of evidence or suspicion of the existence of a fact to be established." *Id.* Further, determinations regarding witness credibility and the weight of the evidence

34

## Conclusion

Based on the foregoing, the trial court erred in concluding that Parcel 59 was not landlocked due to PennDOT's actions and that the Coal Companies had alternative access to Parcel 55 by way of the surface of Parcel 59. The trial court also erred in assessing whether the coal underlying Parcel 55 was mineable and permittable at the preliminary objections stage, where such questions should have been left to the board of viewers to decide at the damages stage. Consequently, we reverse the trial court to the extent it concluded a *de facto* taking did not occur. We reverse the trial court's order sustaining PennDOT's preliminary objections and remand to the trial court to determine the extent and date of the taking within the meaning of 26 Pa.C.S. §502(c)(2) and, thereafter, to appoint a board of viewers to determine the amount of damages, if any, to be awarded the Coal Companies.

_____
PATRICIA A. McCULLOUGH, Judge

---

are made by the trial court sitting as the finder-of-fact and this Court will not disturb them on appeal. *Beaver Falls Municipal Authority ex rel. Penndale Water Line Extension v. Beaver Falls Municipal Authority*, 960 A.2d 933, 940 (Pa. Cmwlth. 2008); *1301 Filbert*, 441 A.2d at 160.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

PBS Coals, Inc. and Penn                     :
Pocahontas Coal, Co.,                        :
            Appellants               :
                               :   No.  140 C.D. 2018
          v.                       :
                               :
Commonwealth of Pennsylvania,                :
Department of Transportation                 :

## ***ORDER***

AND NOW, this 28th day of March, 2019, the order of the Court of Common Pleas of Somerset County (trial court), dated January 19, 2018, is reversed. The matter is remanded to the trial court to determine the extent and date of the taking within the meaning of 26 Pa.C.S. §502(c)(2) and, thereafter, to appoint a board of viewers to determine the amount of damages, if any, to be awarded to PBS Coals, Inc. and Penn Pocahontas Coal, Co.

      Jurisdiction relinquished.


                                _____
                                PATRICIA A. McCULLOUGH, Judge