**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| PBS COALS, INC. AND PENN POCAHONTAS COAL, CO., | : | No. 41 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Commonwealth Court entered |
| | : | March 28, 2019 at No. 140 CD |
| | : | 2018, reversing the Order of the |
| v. | : | Court of Common Pleas of |
| | : | Somerset County entered January |
| | : | 23, 2018 at No. 98 Civil 2015 and |
| COMMONWEALTH OF PENNSYLVANIA, | : | remanding |
| DEPARTMENT OF TRANSPORTATION, | : | |
| | : | SUBMITTED: April 16, 2020 |
| Appellant | : | |

**OPINION**

**JUSTICE DONOHUE**                    **DECIDED: JANUARY 20, 2021**

We granted the Commonwealth of Pennsylvania, Department of Transportation ("PennDOT")'s petition seeking review of the Commonwealth Court's holding that a de facto taking of an unmined coal estate, owned by Penn Pocahontas and leased to PBS Coals, Inc. (collectively "the Coal Companies"), occurred under the Eminent Domain Code, 26 Pa.C.S. §§ 101-1106 ("Code"), when PennDOT's construction of Highway 219 on an adjoining parcel destroyed options for constructing rights-of-ways to the coal estate's surface. In reaching that conclusion, the Commonwealth Court held that the feasibility of mining the coal, as measured by the probability of obtaining a legally required permit from the Department of Environmental Protection ("DEP"), was relevant only to damages. We reverse the Commonwealth Court's decision, as we agree with PennDOT

that the legality of extracting the coal goes directly to the trial court's duty to determine whether a taking occurred. We further find that the Commonwealth Court erred by failing to remand the case for consideration of whether consequential damages are available to the Coal Companies. We therefore reverse and remand to the Commonwealth Court with instructions to remand to the trial court with respect to the Coal Companies' consequential damages claim.

## I. Factual and Procedural History

In the 1970s, condemnee Penn Pocahontas Coal Company acquired approximately 25,000 acres of land situated in Somerset County spanning roughly 250 properties. Penn Pocahontas does not mine the coal but instead leases those rights to companies such as co-condemnee PBS Coals, Inc. and receives royalties from the sales. The precise parcel involved in this case is an unmined seventy-three-acre tract of land referred to as Parcel 55. Its mineral rights were severed from the surface rights in June of 1971. N.T., 2/14/2017, at 1.31. Today, Penn Pocahontas owns the coal rights while the surface rights are retained by private citizens. Two seams of coal sit beneath Parcel 55, the rights to which were leased to PBS Coals in 2006.

Prior to construction of Highway 219, Parcel 55 lacked frontage and was only accessible via options to construct private rights of way. The surface owners of Parcel 55 retained the right to construct a fifty-foot-wide private route across Parcel 54, which bounded Parcel 55 on the east, continuing through a sixteen-foot-wide right of way across Parcel 50 onto Garrett Shortcut Road and the highway system. The specifics were to be determined by the surface owners.

The Coal Companies averred that this potential route was destroyed when PennDOT acquired a north-south strip of land on Parcel 54 by a deed in lieu of condemnation dated June 14, 2010. The construction cut off the possibility of west-to-east access from Parcel 55 and thereby precluded development of the unimproved private trails. The Coal Companies thereafter filed a petition under Section 502(c) of the Code alleging a de facto taking, which "occurs when the entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property." *Conroy-Prugh Glass Co. v. PennDOT*, 321 A.2d 598, 599 (Pa. 1974) (citation omitted). *Accord McElwee v. SEPTA*, 948 A.2d 762, 764 (Pa. 2008) (same).

There is no dispute that PennDOT is clothed with the power of eminent domain. The point of contention here is whether the highway construction on Parcel 55 substantially deprived the Coal Companies of the use and enjoyment of the coal estate. "An owner of a property interest who asserts that the owner's property interest has been condemned without the filing of a declaration of taking may file a petition for the appointment of viewers." 26 Pa.C.S. § 502(c)(1). The viewers "shall view the premises, hold hearings and file a report." 26 Pa.C.S. § 504(a)(1). The condemnor may file preliminary objections to the appointment and if issues of fact are raised the court must receive evidence. Once an issue of fact is raised, the viewers cannot take evidence on this issue. 26 Pa.C.S. § 504(d). The trial court "shall determine whether a condemnation has occurred, and ... the condemnation date and the extent and nature of any property interest condemned." 26 Pa.C.S. § 502(c)(2). The court "shall enter an order specifying any property interest which has been condemned and the date of the condemnation." 26 Pa.C.S. § 502(c)(3).

At the evidentiary hearing, the Coal Companies identified three issues: whether there was a taking; if so, the extent of the taking; and the date of the taking. The Coal Companies alleged that under the prior version of the Code, effective through August 31, 2006, the latter two issues "were thought to be … within the province of the board of viewers[.]" N.T., 2/14/2017, at 1.11. In contrast, the 2006 amendments "clearly established that it's this [c]ourt's duty to make those determinations[.]" *Id.* at 1.12.[1] The Coal Companies argued that PennDOT's preliminary objections were relevant only to the value of the property and hence an issue of damages to be decided by the board of viewers.

The Coal Companies' petition pled two counts. At count one, the Coal Companies argued that the coal "underlying [Parcel 55] is no longer accessible," due to highway construction on Parcel 54. In this respect the petition treated the Coal Companies' surface estate rights and mineral estate rights identically, i.e. the right to transport the coal off Parcel 55 presented the same legal issues as the further inability to access the parcel for purposes of extracting and transporting the coal. "As a result of the PennDOT Deed in Lieu of Condemnation, the coal under [Parcel 55] is now isolated and not capable of being mined." Petition, 2/19/2015, at 4.

---

[1] The current Code was enacted in 2006, largely in response to *Kelo v. City of New London*, 545 U.S. 469 (2005) (holding that economic development by private enterprises can justify taking of property as a "public use" under the Fifth Amendment). *See Alpha Fin. Mortg., Inc. v. Redevelopment Auth. of Fayette Cty.*, 152 A.3d 375, 380 (Pa. Commw. 2016) (explaining that the repeal of the former Eminent Domain Code and its replacement "sought to counteract *Kelo* and expand protections for condemnees by limiting the ability of governments to take private property for private use, reinforcing that a taking must be for a valid public use."). In *McMaster v. Twp. of Bensalem*, 161 A.3d 1031, 1036 (Pa. Commw. 2017), the Commonwealth Court stated that "there is no difference between the former Eminent Domain Code and the current Eminent Domain Code on the issues in this appeal of de facto taking and consequential damages."

At count two, the Coal Companies sought consequential damages pursuant to 26 Pa.C.S. § 714. "All condemners, including the Commonwealth, shall be liable for damages to property abutting the area of an improvement resulting from change of grade of a road or highway, permanent interference with access or injury to surface support, whether or not any property is taken." That count incorporated the foregoing complaints and argued that the coal "has been permanently isolated by PennDOT . . . [by] taking the only access PBS and Penn Pocahontas had to and from [Parcel 55] from a public road." Petition, 2/19/2015, at 7.

PennDOT filed preliminary objections asserting that no de facto taking occurred because the Coal Companies "have not been deprived of the beneficial use and enjoyment of their property," Preliminary Objections, 4/16/2015, at 1. PennDOT noted that the Coal Companies "had not applied for any mining permits for Parcel 55," and any damages "are mere speculation" not compensable under the Code. *Id.* at 2. PennDOT requested dismissal of the petition or, in the alternative, an evidentiary hearing.

The Coal Companies replied and, in relevant part, argued that the loss of access is itself a taking, which directly caused the loss of the coal. "Loss of access caused by a governmental entity in and of itself is compensable as an inverse or de facto taking. Since the tract of coal containing 73 acres is no longer accessible by reason of the action of [PennDOT], the same should be deemed [i]solated [c]oal. … ." Answer, 5/4/2015, at 2. The Coal Companies requested an evidentiary hearing.

The trial court held a three-day hearing, with testimony taken on the history of the various deeds and conveyances to determine whether the Coal Companies had rights of way to Garrett Shortcut Road or whether those rights were exclusively held by surface

owners. The parties also presented evidence regarding the likelihood of the Coal Companies obtaining a mining permit from DEP. With respect to this latter point, PennDOT stated that the "ability to obtain a permit had to have been reasonably certain; that it cannot be speculation and conjecture." N.T., 2/14/2017, at 1.15. Following the hearing both parties submitted proposed findings of fact and law. PennDOT urged the court to find that no taking occurred because access through Parcel 54 was illusory for one of three reasons: (a) the fourteen-foot right of way on Parcel 50 was not wide enough to accommodate mining operations; (b) the connecting right of way on Parcel 55 to Parcel 50 was reserved only to the surface owners; and/or (c) a necessary highway occupancy permit would not be issued on Parcel 50. Alternatively, PennDOT argued that another route existed through other parcels of land on which the Coal Companies had mining rights, i.e. a route to Mud Pike Road.[2] PennDOT further argued that no taking occurred because the Coal Companies could not establish a reasonable likelihood that a DEP permit would be issued for various environmental reasons. PennDOT claimed that any mining operation was speculative in nature and the Coal Companies therefore failed to establish that a de facto taking occurred.

As to access, PennDOT attempted to introduce evidence that a temporary bridge could be constructed. In its opening argument before the evidentiary hearing, PennDOT's counsel stated, "We have a cost to cure. PennDOT is willing to finance a bridge over the new road, a temporary bridge to allow PBS to extract the coal from Parcel 55." *Id.* at 1.13. Following conclusion of the opening remarks, the trial court asked if the possibility of a

---

[2] PennDOT also alleged that the Coal Companies waived their right to contest the loss of the right of way through Parcel 54 because they failed to file preliminary objections at the Parcel 54 proceedings. That argument is no longer at issue.

bridge had been discussed before the hearing. *Id.* at 1.17. Counsel for PBS replied, "the first time we heard of it was last week[.]" *Id.* The Coal Companies later argued that post-taking remedies are legally irrelevant. N.T., 2/15/2017, at 2.11. In its proposed findings of fact and law, PennDOT cited the testimony of its witness John A. Vitez, the chief highway engineer and project manager for Highway 219, who testified that a temporary bridge capable of handling mining operations could be built at a cost of approximately $2.3 million. *Id.* at 2.70.

The trial court sustained PennDOT's preliminary objections and issued a memorandum setting forth its findings of fact and conclusions of law. The court disagreed with PennDOT's assertion that Garrett Shortcut Road was inaccessible and found that the Coal Companies had rights of way that were severed, causing Parcel 55 to become landlocked. Conversely, the court agreed with PennDOT that alternative access to highways existed via the Mud Pike Road route because the relevant leases for the other properties contemplated a proposed haul road and an "affected area" encompassing multiple surface mine pits. As a result, the trial court concluded that no taking had occurred.

The trial court further addressed the issue of whether the Coal Companies had demonstrated that they could obtain the necessary permits to mine the coal in the coal estate. The Coal Companies called two expert witnesses, Louis T. Pierce, a registered professional geologist, and Robert Kudlawiec, a licensed engineer, both of whom opined with a reasonable degree of certainty that a surface mining permit could be obtained if an application was submitted. Mr. Pierce testified that any on-site streams and the small area of present wetlands could be mitigated. N.T., 2/14/2017, at 1.84. Mr. Kudlawiec

agreed, indicating that replacement wetlands could be established elsewhere on the property.  *Id.* at 1.137.  As such, both experts testified that the present streams and wetlands would not pose an insurmountable hurdle to obtaining a DEP permit.  In this regard, the experts offered testimony regarding the coal seams.  The first seam is known as the Clarion Rider seam and the second seam is referred to as Brookville A seam.  The average depth from the surface of the Brookville A seam was eighty-seven feet, while the Clarion Rider was approximately forty to fifty-five feet from the surface.  *Id.* at 1.75-1.76.  These numbers were relevant to the overburden analysis, which is the material that must be removed to mine the coal.  *Id.* at 1.79.  Mining has the potential to produce acid discharge, and anyone submitting a mining permit application must demonstrate "that there is no presumptive evidence of potential pollution to the water of the Commonwealth."  25 Pa. Code §86.37(a)(3).[3]  To counter acid discharge, Mr. Pierce testified that miners "use special handling plans and alkaline addition," N.T., 2/14/2017, at 1.80, opining that the overburden on these sites could be neutralized with 2,220 tons per acre of an alkaline solution.  *Id.* at 1.81.  Mr. Kudlawiec testified that while Mr. Pierce had provided an "initial quantity" of 2,200 tons of alkaline per acre, they would in fact use 7,000 tons per acre to neutralize the acid on these sites.  *Id.* at 1.153.

These experts acknowledged that an endangered species of bat was on Parcel 55, thus requiring compliance with the Federal Endangered Species Act.  Both Mr. Pierce

---

[3]  Both experts noted that PennDOT had obtained permits to mitigate the wetlands and streams on nearby parcels, including Parcel 54, which were required to construct Highway 219.  Mr. Kudlawiec admitted, however, that the highway overburden extraction only went down to fifty or fifty-five feet, considerably less than the eighty-seven feet that the Brookville A mining operation would require.  N.T., 2/16/2017, at 3.53.

and Mr. Kudlawiec, however, expressed confidence that its habitation could be mitigated. N.T., 2/16/2017, at 3.48.

On cross-examination, Mr. Pierce was asked if "modules" six, seven, and eight had been prepared. "Modules" are large studies, including those assessing environmental impacts, that must be submitted with a DEP surface mining permit application.[4] Module six involves investigating water sources and conducting sampling. *Id.* at 1.89. Number seven is the geology module and "requires the geologist to drill the site and obtain … overburden samples and analysis of that overburn to determine the chemistry of the rocks." *Id.* at 1.61. Module eight is the "write-up portion of the hydrogeology and the hydrology, difference between the surface water and ground water." *Id.* at 1.60-1.61. Mr. Pierce confirmed that none of these studies had been performed for the mining of coal on the Clarion Rider and Brookville A seams on Parcel 55. *Id.* at 1.91.[5]

---

[4] Mr. Pierce stated that he believed the total number of modules required was eighteen. N.T., 2/14/2017, at 1.94. Mr. Kudlawiec testified there are "twenty-two or twenty-three modules as part of the application, but some are not utilized in every application." *Id.* at 1.150.

[5] There is no dispute that the Coal Companies never applied for a mining permit. Timothy Williams, the president of Penn Pocahontas, testified on cross-examination:

> Q.  Can you tell us why you never mined that coal in the 1970s, '80s, '90s, into the early 2000s?
>
> A.  There's a lot of coal reserves in the United States. They're not all mineable at the same time. There's a hierarchy you use when you mine coal and when you don't. A function of market, function of engineering, function of whether you are mining somewhere else.
>
> * * *

PennDOT called Daniel Sammarco as an expert witness. Mr. Sammarco is employed by the DEP's Cambria District Mining Office as its District Mining Manager, a position he has held for five years. It is his responsibility to ensure that the permitting process complies with the Surface Mine Reclamation Act. N.T., 2/15/2017, at 2.94. He testified in detail about the extensive pre-application and application processes to be followed by an operator seeking a surface mining permit. The permit application itself consists of twenty-seven modules, some of which are required in every instance and others more selectively. *Id.* at 2.96.

Mr. Sammarco testified that he could not state to a reasonable degree of professional certainty that his office would grant a permit to the Coal Companies to surface mine the Clarion Rider or Brookville A seams on Parcel 55. *Id.* at 2.119. He first testified that he is not aware of any evidence that the Coal Companies have conducted any stream and wetland impacts studies or performed an over-burden analysis. Indeed, Mr. Kudlawiec was not aware of the existence of an intermittent stream on the property until he appeared in court. N.T., 2/16/2017, at 3.41 - 3.42. Addressing the on-site streams and wetlands, those would require separate permits from DEP as well as a federal permit under the Federal Clean Water Act (in addition to necessary permits from federal

---

Q. Have you or any of the operators that you have -- including PBS -- that you may have leased parcel 55 to, have you ever sought a mining permit?

A. Penn Pocahontas has never filed mining permit for that parcel.

N.T., 2/14/2017, at 1.23-1.24.

agencies that protect endangered animal species). Once all these hurdles are cleared, the Coal Companies would still need to demonstrate to DEP that the acid mine drainage will be sufficiently neutralized so that waters will not be polluted. Mr. Sammarco testified that 7,000 tons of alkaline per acre "would provide a level of concern in reviewing the application," whereas the 2,200 tons per acre number was a more standard number for permits. N.T., 2/15/2017, at 2.129.

Mr. Sammarco also identified two prior experiences with PBS Coals that would constitute serious impediments to the issuance of a surface mining permit. The first was "Job 21." A permit was issued in the mid-1970s for the Brookville A seam of coal at a location near Parcel 55. Post-mine discharges developed and negatively affected the water supply of the Borough of Garrett. *Id.* at 2.112. At the hearing before the trial court, Mr. Sammarco testified that PBS Coals failed to bring forth documents or substantive testimony on their continuing activity at the Job 21 site to demonstrate that the problems there are unlikely to be exacerbated by more surface mining on Parcel No. 55. Mr. Sammarco testified that the Project 21 debacle would be a relevant consideration if an application to surface mine Parcel 55 at the location in question were filed. *Id.* at 2.115.

Second, PBS Coals failed to address adequately the potential impact of surface mining Parcel 55 on the Black Mountain Mine site. Mr. Kudlawiec disclosed that the Black Mountain Mine was on a nearby property and that, among other problems, adverse geologic and water conditions were encountered. PBS Coals' Exhibit 15, at 4. According to Mr. Sammarco, this omission raised further questions regarding a finding of permitability.

Finally, Mr. Sammarco testified to the existence of a note authored by another DEP employee regarding a 2005 meeting with PBS Coals' representatives concerning the possibility of mining one of the two seams underneath Parcel 55. The note reflected a belief that "the potential for successfully permitting the targeted reserves is low, because, given currently known facts, the potential for generating additional pollution is high." N.T., 2/15/2017, at 2.121.

After review and consideration of the evidence, the trial court concluded that the "ability to obtain a surface mining permit from the Cambria District Mining Office for Parcel 55 is speculative and uncertain and, accordingly, incapable of supporting a claim of a taking of a property right....". Order and Memorandum, 1/29/2018, at 18.[6] The trial court analogized the present facts to cases where "the condemnee's burden was to prove that the property was ripe for development, that they had taken meaningful steps toward development, and there was 'virtually no conjecture as to the reasonable certainty' of the

---

[6] The trial court's initial findings of fact stated that "[t]here was no testimony that the Petitioner's experts have, to this point, studied stream and wetland impacts or performed an over-burden analysis, which matters are essential elements of the permit process." Order and Memorandum, 1/29/2018, at 14. In its trial court opinion, the court acknowledged that this was partially incorrect:

> The court acknowledges its statement as overly broad, and therefore erroneous. The approval of the surface component for the A Seam Deep Mine is, however, far less exhaustive in its review and approval process than the context of a complete surface mine for the entire parcel. The former focuses on displacing overburden at one fixed point to obtain access for a deep mine portal. The latter requires a review of the complete displacement of the overburden on the entire tract and the ability to assure that acid mine drainage can be avoided during and after mining operations.

Trial Court Opinion, 4/26/2018, at 3.

development." *Id.* at 17. While acknowledging that the legal principles applied in those cases pertained to valuations, the court referenced its factual findings and reaffirmed its conclusion that the "ability to obtain a surface mining permit ... is speculative and uncertain and, accordingly, incapable of supporting a claim of a taking of a property right[.]" *Id.* at 18.

The Coal Companies appealed to the Commonwealth Court, which reversed and remanded for further proceedings in a published opinion. *PBS Coals, Inc. v. PennDOT*, 206 A.3d 1201, 1223 (Pa. Commw. 2019), *appeal granted in part*, 218 A.3d 373 (Pa. 2019). The companies raised three arguments. The first challenged the conclusion that alternative access to Parcel 55 was available via Mud Pike Road. Second, the Coal Companies argued that the trial court erroneously considered as a matter of law whether the coal was not mineable due to the unlikelihood of obtaining a DEP permit, as that was strictly an issue of damages for the de facto taking. Third, the Coal Companies argued that the record lacked substantial evidence supporting the trial court's conclusion that a permit was unlikely to issue. The Commonwealth Court ruled in favor of the Coal Companies with respect to the first two allegations, and, as a result, declined to consider whether substantial evidence supported the permit finding. *Id.* at 1224 n.10 ("Because we determine that the trial court erred to the extent it examined whether Parcel 55 was mineable and/or permittable at the preliminary objections stage, it is unnecessary for us to address the Coal Companies' third issue raised on appeal….").

Regarding the conclusion that PennDOT did not effectuate a de facto taking because the Coal Companies maintained alternative access via Mud Pike Road, the Commonwealth Court disagreed after examining the language of the relevant leases. It

is well-settled that the right to mine coal creates an implied right "to use as much of the surface property as necessary for mining operations," *id.* at 1212, but that right goes only so far as is necessary to give effect to the grant of reservation. The coal rights owner may move coal from adjoining lands through the passages opened for removal until the coal estate is terminated but it cannot use the surface estate to transport foreign minerals. In other words, the implied rights to the surface do not extend to removing minerals mined from other lands absent express contractual language to that effect. The Commonwealth Court reviewed the leases and found nothing to indicate an express grant of that surface right. "Here, the plain language ... does not manifest an intention to permit the Coal Companies to access Parcel 55 by way of the surface of Parcel 59." *Id.* at 1215. The court further rejected arguments that other provisions, when read together, created such a right. *See id.* at 1215-17. Accordingly, the court concluded that Parcel 55 was landlocked as a matter of law.

Turning to the permit issue, the Commonwealth Court agreed that any questions concerning the likelihood of securing a mining permit is a matter of damages and therefore irrelevant to whether a taking occurred. The Commonwealth Court distinguished a trio of cases relied on by the trial court, discussed in more detail infra, that applied the Commonwealth Court's "speculative and conjectural" line of analysis to de facto takings. In all three cases, "it was speculative and conjectural that the deprivation of use suffered by the property owners was the immediate and necessary consequence of the condemnation power." *Id.* at 1222. Here, in contrast, the Commonwealth Court indicated that "because the construction of Route 219 resulted in the Coal Companies' complete loss of access to Parcel 55, it is beyond question that the Coal Companies were deprived

of the use of their property as a **direct and immediate consequence** of PennDOT's actions." *Id.* at 1223.

The Commonwealth Court believed that application of the "speculative and conjectural" principle in this case would result in treating mineral estate owners worse than surface right owners:

> Under the trial court and PennDOT's logic, the owners of a coal estate would never be able to demonstrate a *de facto* taking, at the preliminary objections stage, unless they were able to prove that they were likely to obtain a mining permit. However, such a result would place a higher burden of proof on owners of coal estates than owners of surface properties and would effectively relegate owners of coal estates to second class property owner status. This is because, for *de facto* taking cases, coal estate owners would not be able to prove that they suffered a substantial deprivation in the use and enjoyment of their property, at the preliminary objections stage, unless they could establish that DEP would issue a mining permit; unlike surface property owners who do not face any similar requirement to demonstrate a *de facto* taking at the preliminary objections stage, even if their property is relatively valueless or useless.

*Id.*

The Commonwealth Court held that any questions of whether the coal was mineable were irrelevant at the preliminary objections stage and "should have been left to the board of viewers to determine at the damages/valuation stage." *Id.* at 1223-24. The Commonwealth Court did not discuss consequential damages.

We granted PennDOT's petition for allowance of appeal on the following questions:

> 1. Did the Commonwealth Court err in determining that the Coal companies had substantially deprived [sic] of the beneficial use and enjoyment of their mineral rights as a direct and immediate consequence of PennDOT's actions?
>
> 2. Does the Commonwealth Court's decision conflict with the plain language of Sections 502(c)(2) of the Eminent Domain

Code, because it precludes the trial court from determining the extent and nature of a taking?

3. Did the Commonwealth Court err in remanding the matter to the trial court for determination of the extent and the date of the taking pursuant to Section 502(c)(2) of the Code, only?

*PBS Coals, Inc. v. PennDOT*, 218 A.3d 373 (Pa. 2019).[7]  Our standard of review in de facto takings cases is as follows:

> "A landowner alleging a de facto taking is under a heavy burden to establish that such a taking has occurred." *Miller & Son Paving v. Plumstead Township,* 552 Pa. 652, 656, 717 A.2d 483, 485 (1998).  Appellate review in a case where the trial court has sustained preliminary objections to a petition for an appointment of viewers is directed to considering whether the common pleas court's findings are supported by substantial evidence of record, and whether the court abused its discretion or committed an error of law.  *See Sienkiewicz I,* 584 Pa. at 279, 883 A.2d at 500 (citing *Denes,* 547 Pa. at 156, 689 A.2d at 222 (1997)); *In re Condemnation by Municipality of Penn Hills,* 870 A.2d 400, 404 (Pa.Cmwlth.2005).

*McElwee v. SEPTA*, 948 A.2d 762, 771 (Pa. 2008).

## II. Eminent Domain Law

The critical issue in this case is whether, and if so to what extent, PennDOT's activities on Parcel 54 constituted a taking of Parcel 55's coal estate.  The alleged taking in this case centers on the concept of a de facto taking or an inverse condemnation.

### De facto takings

"Inverse condemnation stands in contrast to direct condemnation, in which the government initiates proceedings to acquire title under its eminent domain authority. Pennsylvania, like every other State besides Ohio, provides a state inverse condemnation

---

[7] We did not grant PennDOT's request to review the Commonwealth Court's conclusion that Parcel 55 is landlocked and inaccessible via Mud Pike Road.

action." *Knick v. Twp. of Scott*, ___ U.S. ____, 139 S. Ct. 2162, 2168 (2019) (citing Code). "The Pennsylvania Constitution provides that private property cannot be taken for public use without just compensation." *In re De Facto Condemnation & Taking of Lands of WBF Assocs., L.P.*, 903 A.2d 1192, 1199 (Pa. 2006) (citing Pa. Const. Art. I, § 10). The Code's procedure for requesting a board of viewers represents the General Assembly's implementation of a mechanism to receive compensation for de facto takings. *See Conroy-Prugh Glass Co.*, 321 A.2d at 599 ("The Pennsylvania Legislature recognized the concept of 'de facto' taking when it enacted s[ection] 502(e) of the Eminent Domain Code … .").

The de facto taking concept allows parties to recover where governmental action, while falling short of a physical invasion or appropriation, interferes with property rights to the extent that compensation is required under the United States Constitution. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (noting that Takings Clause was made applicable to the States through the Fourteenth Amendment). "Prior to Justice Holmes's exposition in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393 (1922), it was generally thought that the Takings Clause reached only a 'direct appropriation' of property or the functional equivalent of a 'practical ouster of [the owner's] possession,'" *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) (some citations omitted, bracketing in original). The *Mahon* Court recognized that "the text of the Clause can be read to encompass regulatory as well as physical deprivations." *Id.* at 1028 n.15.

Regulatory measures are perhaps the most common instance of governmental activity that results in a de facto taking. But the concept extends to any governmental action that interferes with property rights. "We have recognized, however, that no magic

formula enables a court to judge, in every case, whether a given government interference with property is a taking." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012). In determining whether a taking has occurred we have looked to United States Supreme Court interpretations of the Fifth Amendment's Takings Clause.[8] "An examination of our case law reveals that this Court has continually turned to federal precedent for guidance in its 'taking' jurisprudence, and indeed has adopted the analysis used by the federal courts." *United Artists' Theater Circuit, Inc. v. City of Philadelphia*, 635 A.2d 612, 616 (Pa. 1993). Thus, in the absence of an argument that the Pennsylvania Constitution offers greater protections than its federal counterpart, *see id.*, we draw upon the high Court's law to determine whether a taking has occurred. *Accord Machipongo Land & Coal Co. v. DEP*, 799 A.2d 751, 763 n.7 (Pa. 2002) (same).

Determining whether a taking has occurred almost always turns on the facts, and as a result takings jurisprudence generally rejects per se rules. "In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area." *Id.*

> True, we have drawn some bright lines, notably, the rule that a permanent physical occupation of property authorized by government is a taking. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). So, too, is a regulation that permanently requires a property owner to sacrifice all economically beneficial uses of his or her land. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). But aside from the cases attended by rules of this order, most takings claims turn on situation-specific factual inquiries. *See Penn Central,* 438 U.S., at 124, 98 S.Ct. 2646.

---

[8] "No person ... shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

*Arkansas Game & Fish*, 568 U.S. at 31–32.[9]

Those few situations aside, consideration of the relevant factual circumstances includes the economic impact of the action. *Penn Central*, 438 U.S. at 124. The economic value of the property encompasses both its present and future use. "Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use." *Mississippi & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408 (1878). This is reflected in the concept of the "highest and best use." *See Olson v. United States*, 292 U.S. 246, 255 (1934) ("The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered ... .") (citing *Rum River Boom*). Determining the highest and best use is often a question of damages as it relates to the owner's compensation, and when the condemnee asserts a use different than the current use, the burden is on the owner. "There are two requirements, and only two, for proving highest and best use. First, the condemnee must show the physical adaptability of the land to such a use, and second it must be demonstrated that this use is needed in the area." *Pennsylvania Gas & Water Co. v. Pennsylvania Tpk. Comm'n*, 236 A.2d 112, 116 (Pa. 1967). As a result, the "highest and best use" inquiry includes consideration of whether the proffered use is reasonably possible. "In determining its value the trial court is required to consider all reasonably possible uses for which the property is adaptable

---

[9] The Coal Companies seem to suggest that this case triggers a per se rule because PennDOT's activities required them to sacrifice the economic value of their coal estate. "Obviously, cutting off all access to a property is the direct and immediate cause of the loss of not only the present use but any potential use." Coal Companies' Brief at 24. *Cf. Lucas*, 505 U.S. at 1017 ("[F]or what is the land but the profits thereof[?]") (quoting 1 E. Coke, Institutes, ch. 1, § 1 (1st Am. ed. 1812)).

and might if reason be applied." *Bolus v. Cnty. of Monroe*, 650 A.2d 1188, 1191 (Pa. Commw. 1994). But the "highest and best use" inquiry may be considered at the takings stage as well. *See WBF Assocs.,* 903 A.2d at 1210–11 ("The actual issue, the highest and best use of the property, was the same in both instances, and the highest and best use of property for purposes of ascertaining a taking is the same as the highest and best use for purposes of setting the fair market value.").

<u>Consequential damages</u>

The Commonwealth Court did not address the Coal Companies' consequential damages claim because of its resolution of the de facto taking claim. The consequential damages statute states:

> All condemnors, including the Commonwealth, shall be liable for damages to property abutting the area of an improvement resulting from change of grade of a road or highway, **permanent interference with access** or injury to surface support, **whether or not any property is taken**.

26 Pa.C.S. § 714 (emphases added).

Cases from both this Court and the Commonwealth Court have stated that the availability of consequential damages is a separate and distinct issue from whether a taking has occurred. In *Colombari v. Port Auth. of Allegheny Cnty.,* 951 A.2d 409 (Pa. Commw. 2008), the Commonwealth Court held that the phrase "whether or not any property is taken" means that liability for consequential damages exists regardless of whether a taking has occurred.

<u>"Speculative and conjectural" takings</u>

The assertion that the Coal Companies were required to establish a reasonable likelihood of obtaining a mining permit as a condition of establishing a de facto taking was

derived from three Commonwealth Court cases examining whether a taking occurred when the governmental interference precludes a use of the land that is alleged to be "speculative or conjectural." We thus examine those cases in more detail to lend context to the parties' arguments.

In *In re Borough of Blakely*, 25 A.3d 458 (Pa. Commw. 2011), landowner John Williams had purchased property in 1966 abutted by a tract of land containing a functioning railroad bed bordering Virginia Avenue. In 1986, he purchased that abutting property, which became the subject of the taking claim. Starting in the late 1960s, the railroad tracks were removed and the land was mined for coal to a depth of ten feet. Over time the property flattened into a ravine, leading to substantial flooding problems that formed a ditch. In 1989, the borough placed a plastic drainage pipe in the ditch and covered it with dirt. A few years later, the borough installed a replacement pipe that extended over the length of the subject property. The borough covered the pipe with twelve feet of fill, which could not support vehicular traffic.

This pipe cut off access to Virginia Avenue. In the early 2000s, William developed an intention to build homes and townhomes on Virginia Avenue. Sometime in 2005 or 2006, Williams asked the borough council to build up the land so that it could support traffic. The borough council did not respond favorably, at which time Williams filed a petition asserting that the borough had effectuated a de facto taking in 1989 when the pipe cut off his access to Virginia Avenue. Williams alleged that the pipe "resulted in a diminution in the value and use of the property." *Id.* at 462. The trial court dismissed the petition on ripeness grounds. Williams appealed. On appeal, the borough argued that

the trial court had ruled correctly because Williams could still develop the property if he accounted for storm water runoff.

The Commonwealth Court affirmed, indicating that "the trial court properly rejected his de facto taking claim as premature and insufficient" because his "claims of injury and substantial deprivation of the use of his property" were speculative and conjectural. *Id.* at 467. Williams "never presented any formal plans to the Borough Planning Commission," did not file any formal requests before that commission, and never spoke to anyone about the zoning permits he would need for developing the lots. *Id.* at 466. The court cited Williams' own testimony from the evidentiary hearing, where he confirmed that his project "hadn't gotten far enough along" to reach the Planning Commission or Zoning Hearing Board stages. *Id.* The appellate court noted that "[t]he Borough never told Owner he cannot build homes on these lots" and the owner "did not explain why access is not possible from another road abutting his property." *Id.* Williams had not taken any concrete steps to develop the properties, including submitting plans to the borough or investigating necessary storm water improvements. *Id.*

*Blakely* favorably cited *Petition of 1301 Filbert Ltd. P'ship*, 441 A.2d 1345, 1346 (Pa. Commw. 1982), in support. Therein, the 1301 Filbert Limited Partnership purchased the Essex Hotel in June of 1974. The hotel "had been closed for several years and was in a state of serious disrepair." *Id.* at 1348. The partnership intended to renovate the building and open a hotel and began renovations in early 1975. The hotel never opened, leading to a de facto taking claim.

Around the time of purchase, the City of Philadelphia had been exploring a large-scale tunnel project. In July of 1975, the federal government began granting funding for

projects such as land acquisition, and the city's Department of Public Property authorized, but did not require, the acquisition of the Essex Hotel. The partnership had been told the Essex was not in the right of way and would not be condemned. The partnership attempted to obtain a short-term construction loan for renovations, but the bank declined the loan, citing the tunnel's construction and predicted interference with the hotel's operation as the reason.

The partnership alleged a de facto taking of the hotel occurred as a result of the construction, because the Essex abutted the route officially designated for the tunnel and an estimated four years of construction was expected to turn the area in front of the hotel into a giant pit, precluding access. The partnership claimed that the tunnel project caused it to lose the needed financing, leading to mortgage foreclosure and the loss of the property. The partnership also offered an expert witness, who opined that the hotel could not have stayed in business anyway due to the construction noise and dust.

The trial court dismissed the petition and the Commonwealth Court affirmed. The court stated that "an important element in the lower court's decision was the determination that the Partnership had not met its proof burden of showing that the alleged detriment, underlying the claim of de facto taking, was the direct and necessary consequence of the Tunnel project and its concomitants." *Id.* at 1359. The *Filbert* panel found that the partnership failed to establish that the construction would have made the hotel financially unviable. While the partnership presented expert testimony on that point, the trial court rejected it. "However, the weight and credibility of the Partnership's testimonial evidence, concerning the impact of the Tunnel work on the prospective or hoped-for patrons of the hotel, was for the determination of the lower court sitting as the finder of fact." *Id.* at 1360.

The court agreed that the construction project would affect the quality of access, but it would not preclude access. "The case at bar is one in which the claim of de facto taking is linked to an alleged injury that is not only prospective but is also speculative and conjectural." *Id.* at 1360.

The final case is *Parker Ave., L.P. v. City of Philadelphia*, 122 A.3d 483, 491 (Pa. Commw. 2015) (en banc), which rejected an allegation that discretionary inaction constituted a taking. There, developer Parker Avenue acquired in 2005 a parcel of land zoned as residential permitting construction of homes by right. This parcel was situated in a park where the local community was known to have strong opposition to development. Parker Avenue nonetheless began planning the construction of forty-eight single family homes along Cinnaminson Street, which bisected the subject property. Cinnaminson Street extended beyond the parcel onto Philadelphia-owned land and had already been improved with sewer lines, fire hydrants, manhole covers, and water basins but was unpaved. Cinnaminson was merely a paper street and was "essentially an unimproved trail." *Id.* at 485. Parker Avenue began acquiring the necessary clearances from the water department and various environmental agencies. The tract to the rest of Philadelphia required paving, and Parker Avenue submitted to the City Council two ordinances to have the street paved.

When these proposed ordinances were not approved, Parker Avenue filed a petition for an appointment of viewers, alleging a de facto taking through deprivation of the property's beneficial use and enjoyment as a residential development. The trial court overruled the city's preliminary objections, concluding that the city's actions "have

rendered [Parker Avenue's] property virtually useless, and has completely precluded the highest and best use of the property." *Id.* at 487 (citing trial court order).

The Commonwealth Court reversed, ruling that the inherently discretionary act of failing to pave roads could not qualify as a taking. The *Parker Avenue* Court recognized that a failure to issue a document required for construction could qualify as a de facto taking if the petitioning party were otherwise entitled to its issuance. However, "Parker Avenue is not entitled to the ordinances it proposed. ... The City's decision whether to enact said ordinances requires weighing competing interests of multiple stakeholders and the best interests of Philadelphia-at-large." *Id.* at 489.

The court next addressed the claim that Parker Avenue had relied on the residential zoning regulations in place at the time it purchased the property, which had permitted the construction of residential buildings as of right. The Commonwealth Court rejected this argument by emphasizing that the parcel was already landlocked at purchase because no legally-open street connected the property to the rest of Philadelphia, and thus the developer knew that it needed governmental support to develop the property. The clear import of the court's analysis was that Parker Avenue's expectations at the time of purchase undercut the finding of a taking. *See Penn Central*, 438 U.S. at 124 ("The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations.").

### III. Parties' Arguments

As a background matter, we note that both parties devote substantial argument to whether the trial court's finding that the Coal Companies failed to establish a reasonable

probability of obtaining a DEP permit is supported by the record. The Commonwealth Court held that the trial court's factual findings in that regard were irrelevant to the legal question, and we likewise accepted review to determine that point of law. As addressed in the text infra, we find that the permit question was properly addressed as a component of the taking analysis.

PennDOT

PennDOT argues that sufficient evidence exists to sustain the trial court's finding that the ability to obtain a permit was speculative and conjectural. To establish a taking, the Coal Companies were required to show that the ability to use their estate, i.e. to exploit their mineral rights through surface mining, was something more than mere speculation. As explained above, no evidence was introduced by the Coal Companies that they had participated in any pre-application process, that they ever filed a surface mining permit application for Parcel 55, or that they had performed any studies to complete any of the modules for a permit to be issued. PennDOT's Brief at 16.

PennDOT analogizes these defects to the line of Commonwealth Court cases involving the "speculative and conjectural" test discussed supra. It describes *Parker Avenue* and *Blakely* as "on all fours with the instant case." PennDOT's Brief at 21. PennDOT views the *Blakey* homeowner's intentions to build housing as directly comparable to the Coal Companies' desire to one day open a mining operation on Parcel 55. The *Blakely* court held that "substantial deprivation of the use of the property was speculative and conjectural, and therefore, did not amount to a de facto taking … ." In PennDOT's view, the same logic applies here because the Coal Companies have not begun the permit process, rendering mining operations a too remote possibility to justify

a de facto taking finding. In *Parker Avenue* the Commonwealth Court held that the planned developments were speculative and conjectural because the necessary permits were not guaranteed to issue. Similarly, the Coal Companies have no guarantee that the required permits for mining will ever issue, establishing that "the Coal Companies' inability to surface mine Parcel 55 was not the direct and immediate consequence of PennDOT's acquisition of Parcel 54 for the highway project." *Id.* at 22. Addressing the *Filbert* hotel case, PennDOT emphasizes the aspect of the Commonwealth Court's granting deference to the trial court's rejection of the partnership's expert witness testimony. *See* PennDOT's Brief at 25 ("This deference of the Commonwealth Court to the trial court as the finder of fact is entirely missing in the decision in the instant case.").

PennDOT submits that the Commonwealth Court's primary reason for distinguishing those three cases, i.e. the fact that the property owners therein all retained access to the surface estate and could continue to use the property for some purpose, is flawed. PennDOT deems it irrelevant whether the Coal Companies have physical access to transport coal from Parcel 55. "[I]f the Coal Companies cannot legally extract the coal, PennDOT did not substantially deprive the Coal Companies of the use of their mineral rights and the Court never has to address the access issue." *Id.* at 24. The Commonwealth Court's further distinction of identifying the highest and best use of the land as a coal mine is similarly flawed. Finding "that the highest and best use of the coal estate is for mining coal ... puts the cart before the horse," *id.*, because the condemnees are not mining coal. Therefore, the Coal Companies are attempting to do the same thing as the three landowners in *Blakely*, *Parker Avenue*, and *Filbert*; namely, establish a use of the property different from its current use. PennDOT argues that the "highest and best

use" analysis is assessed in the damages phase when access to a surface interest is completely cut off. Here, where the property interest is subsurface rights, the Coal Companies must establish that the coal is legally mineable. Otherwise, the Coal Companies would receive a windfall.

Turning to the second issue regarding the structure of the Code, PennDOT claims that the Commonwealth Court's categorical holding that issues surrounding the permit process are irrelevant to the takings analysis is contrary to the Code's scheme. The trial court is exclusively authorized to determine the extent and nature of a taking. Applying the Commonwealth Court's holding here, the trial court cannot determine whether a taking occurred because the legal inquiry, which calls for consideration of whether the Coal Companies were deprived of the use of their coal estate, necessarily required an analysis of whether the coal could be "enjoyed," i.e., legally mined. Thus, precluding trial courts from considering evidence about permitability is contrary to the statutory language. Furthermore, PennDOT observes that the Commonwealth Court's holding means that the trial court should have immediately appointed a board of viewers. In that scenario, the board would have heard the extensive testimony presented to the judge herein, which would then be reproduced upon any appeal from their report in de novo proceedings.

With respect to the third issue, PennDOT does not contest that the Coal Companies are entitled to litigate their claim for consequential damages on remand.

<u>The Coal Companies</u>

The Coal Companies urge affirming the holding that any questions regarding the likelihood of obtaining a DEP permit are relevant only to damages and do not factor into the taking analysis. The Coal Companies emphasize that the taking of access is itself a

de facto taking and a fully compensable right. Coal Companies' Brief at 21 (citing *McElwee*, 948 A.2d at 775-76). Because the right of access to a mineral estate is protected to the same degree as access to the surface rights, *Belden & Blake Corp. v. DCNR*, 969 A.2d 528,532 (Pa. 2009), the right-of-way taking that caused Parcel 55 to become landlocked constituted a taking of the coal estate. The appellees posit that PennDOT's position creates an absurdity because by their logic "until a permit is secured there is no estate and **no value** in a coal estate." *Id.* at 25. The Coal Companies rely, with little elaboration, on cases that deal with loss of access to surface uses. "Simply put, and as caselaw cited above (*McElwee* supra) indicates, when access to property is permanently eliminated by government action, a taking has occurred and the value of what has been taken is properly determined by the Board of Viewers." *Id.* at 27.

Turning to the three Commonwealth Court cases discussed supra, the Coal Companies agree with the Commonwealth Court's distinctions. The companies describe *Filbert* as a case in which "the damages were speculative and conjectural because there was no proof of damages in any form; the owners retained access and had no evidence of economic damages." *Id.* at 29. *Blakely* likewise involved a case where the owner "was never deprived of access, never prohibited from building, and failed to prove any other basis for his claim." *Id.* at 30 (emphasis omitted). Finally, *Parker Avenue* is inapposite because the owner, when he purchased the land, knew the parcel was landlocked. That is not the case here because Parcel 55 became landlocked after the relevant property interest was obtained. In contrast to those cases, the loss of access here has precluded any use of the property whatsoever.

Turning to the second issue, the Coal Companies argue that resolution of the first issue resolves this point of error as well. The Commonwealth Court held that the "highest and best use" was a coal estate. Therefore, the extent of the de facto taking was the entire coal estate and the only issue left is damages. As a result, the remand order is not inconsistent with the Code. The board of viewers can award just compensation by considering, among other factors, whether a permit is likely to issue now or in the future and adjust the amount of damages based upon that determination.

Regarding the last issue, the Coal Companies concede that no consequential damages are available following the Commonwealth Court's holding. "Consequential damages only apply when there has been a negative [e]ffect upon the property but that does not result in a taking of the property. *Id.* at 46. The consequential damages claim "was made moot by the determination that a de facto taking of the property has occurred." *Id.* at 47.

Finally, the Coal Companies maintain that while the Commonwealth Court correctly determined that the permit issue was irrelevant to the takings analysis, the trial court's findings were not sufficiently supported by evidence of record.

## IV. Analysis

For the following reasons, we conclude that the Commonwealth Court erred by finding a de facto taking of the coal estate occurred by operation of law. The Coal Companies are not presently using their coal estate, and their inability to establish a likelihood of securing a permit implicated the legal question of whether a taking occurred, not damages for a de facto taking. We are therefore aligned with PennDOT's view that

the trial court correctly considered the issue of permitability under the Code's provisions requiring the trial court to determine whether a taking occurred.

We begin by considering the three "speculative and conjectural" cases that serve as a backdrop to our analysis. We agree with the Commonwealth Court that *Filbert* and *Parker Avenue,* two of the three "speculative and conjectural" cases, are readily distinguishable and shed little light on whether a taking has occurred in this case. The *Filbert* court placed great emphasis on the fact that the trial court rejected the expert's testimony that the hotel, had it been an ongoing business, would have been hurt by the ongoing construction. Furthermore, the construction project, while certainly diminishing the quality of access, did not completely foreclose access. Thus, that the property retained some economic value notwithstanding the fact that construction would impact its operation was a critical component of the takings analysis.[10] *Parker Avenue* is similar. There, the developer's parcel retained economic value, 122 A.3d at 489 ("Parker Avenue can still build a single dwelling now, as it was permitted to do on the date of purchase"), and the purported taking in that case involved discretionary inaction stemming from failures to issue permits. Furthermore, *Parker Avenue* involved an assertion that the

---

[10] In *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992), the high Court observed that takings law is "full of these 'all-or-nothing' situations":

> It is true that in at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. But that occasional result is no more strange than the gross disparity between the landowner whose premises are taken for a highway (who recovers in full) and the landowner whose property is reduced to 5% of its former value by the highway (who recovers nothing). Takings law is full of these "all-or-nothing" situations.

*Id.* at 1019 n.8.

discretionary failure to issue ordinances constituted the relevant act for a de facto taking. The Coal Companies do not contend that DEP's failure to issue a permit is a de facto taking (as no permit application has even been filed), but rather that PennDOT's construction of Highway 219 was the relevant act.

The two cases are further distinguishable because there is no suggestion that the Coal Companies' investment expectations should have contemplated the construction of a highway on those lands at the time of purchase. In *Parker Avenue*, the parcel was already landlocked, and the fact that a portion of the parcel which had existing access to the city was severed and sold for a much higher per acre sum was an important factor. And in *Filbert*, the investors' awareness that the tunnel project was a possibility formed a part of the analysis. The hotel also retained some economic value because the construction merely diminished but did not foreclose access to the hotel.

We agree with PennDOT that *Blakely* is on point. The owner in *Blakely* asserted that he presented sufficient facts to establish a de facto taking based on his claim that the local government's placement of a PVC pipe blocked vehicular access to lots on which he wished to build homes. As previously described, the owner never took concrete steps to establish that actual development would occur. Hence, the PVC pipe blocked nothing.

The same logic employed in *Blakely* applies here. Highway 219 does not block the Coal Companies from enjoying their coal estate, and the Coal Companies have failed to meet their heavy burden to establish that a de facto taking has occurred. The Commonwealth Court identified the de facto taking test as having three elements. *PBS Coals*, 206 A.3d at 1219. The first is that the condemnor has the power to condemn, which is not at issue here. The second element is whether the act substantially deprived

the owner of the beneficial use and enjoyment of the property. The third requires a finding of causation, namely that the deprivation is the immediate, necessary and unavoidable consequence of the governmental action. The Commonwealth Court's analysis essentially skipped the second element by concluding "it is beyond question that the Coal Companies were deprived of the use of their property as a direct and immediate consequence of PennDOT's actions." *PBS Coals*, 206 A.3d at 1223.

We disagree, as the Coal Companies failed to establish the second element of the takings test. They presented insufficient evidence to demonstrate that they possessed any "beneficial use and enjoyment of the property" (the coal estate). The Coal Companies cannot use and enjoy their coal estate because there is no mining operation on the Parcel 55 property, and they did not meet their heavy evidentiary burden to establish any likelihood that they will be able to obtain a surface mining permit to begin a mining operation to extract the coal. The Commonwealth Court identified *Blakely*, *Filbert*, and *Parker Avenue* as "hing[ing], to a certain degree, on the causation prong of the de facto taking test, i.e., whether the substantial deprivation of use was the 'immediate, necessary and unavoidable consequence of the exercise of the power to condemn.'" *Id.* at 1222. There is little doubt that Highway 219 **would be** the immediate and necessary consequence of the Coal Companies' inability to use and enjoy their coal estate **if** a mining operation existed, or could be commenced with a permit, on the property.[11] However, just as the PVC pipe in *Blakely* was only theoretically precluding the landowner from developing the property as he wished, the highway is only theoretically preventing

---

[11] Of course, under those circumstances PennDOT may well have opted to provide alternative access as part of its highway construction plans.

the Coal Companies from using their coal estate. As things stand, the coal estate sits idle and may not be mined; therefore **Highway 219 has not resulted in any deprivation to the Coal Companies whatsoever**. Under the facts presented here, we never reach the third element of the takings test (causation), as the Coal Companies have not satisfied the second element (a deprivation).

The Commonwealth Court held that the likelihood of obtaining a permit was entirely irrelevant at the preliminary objections stage on the issue of whether a taking took place, and therefore the trial court erred by not directing the board of viewers to consider that issue at the damages stage. We disagree.[12] The trial court's determination that a permit was not likely to issue goes directly to whether the Coal Companies established that PennDOT's construction substantially deprived the condemnees of the beneficial use and enjoyment of their coal estate.

The lodestar of the Commonwealth Court's analysis was its conflation of the surface estate rights with the coal estate rights, reasoning that the inability to access the parcel necessarily caused the Coal Companies to lose the enjoyment of their coal estate.[13] In *Blakely*, continuing access was important because the surface rights owner

---

[12] PennDOT has litigated this case under the assumption that if the Coal Companies were able to establish to the trial court's satisfaction a reasonable probability of obtaining a DEP permit then a de facto taking occurred. We accept that premise for purposes of our disposition.

[13] With no further development, the Coal Companies cite and quote *Belden & Blake Corp. v. DCNR*, 969 A.2d 528 (Pa. 2009), as definitively settling this issue. The case is distinguishable. Therein, Belden owned or leased mineral rights on lands owned by the Commonwealth. When Belden informed the Department of Conservation and Natural Resources (DCNR) that it was in preliminary stages of developing gas wells, the DCNR sought to impose conditions on Belden's access, including fees for removing timber that were double the fair market value of the material. Belden alleged that the DCNR's

was using the land for some purpose. That merely reflects the fact that surface owners enjoy a broad array of uses, whereas here the Coal Companies can enjoy their coal estate in only one way: mining coal. The Coal Companies rely on *McElwee*, 948 A.2d 762, to support its argument that a de facto taking occurred here. There, the Southeastern Pennsylvania Transport Authority (SEPTA), in the course of three years of construction work, interfered with access to a printing shop to a degree that the day-to-day operations of the business were made impossible. The shop lost business and closed its doors, all of which was attributable as a matter of law to SEPTA's activities. "[W]e find that the trial court failed to adequately support its conclusion that Appellees did not establish any causal link between SEPTA's actions and the closure of their business." *Id.* at 772–73. We thus held that SEPTA's preliminary objections should have been overruled. *McElwee* is not comparable to the present circumstances. That case involved the substantial deprivation of an actual use of a surface estate caused by SEPTA's acts. Again, there is no present use of the coal estate whatsoever. This is not a case where PennDOT's construction activities interfered with an ongoing coal mining operation.

The Commonwealth Court equated the fact of ownership of subsurface rights, i.e., a coal estate, with the highest and best use of that ownership interest. According to that

_____

conditions were tantamount to a de facto taking. We found that partial summary judgment was warranted in Belden's favor. Belden had a right to access and its exercise of its subsurface rights was reasonable. "A 'regular' surface owner cannot unilaterally impose extra conditions on the subsurface owner beyond those that are reasonable." *Id.* at 532-33. We determined that the government was held to the same standard notwithstanding potential constitutionally based fiduciary duties connected to the DCNR's role in preserving state lands under the Pennsylvania Constitution.

*Belden* does not support the Coal Companies' position. The government is not imposing any conditions on access but rather a condition on opening the mine. Nor does the government own Parcel 55's surface rights.

court, the Coal Companies did not have any burden to establish that the coal was legally mineable. Because it was uncontroverted that coal existed in their subsurface parcel, to require subsurface rights owners to establish that a permit to mine the coal was likely to issue would treat subsurface rights owners differently and worse than surface rights owners.

The defect in the Commonwealth Court's logic is that mere ownership of a property right is not a use, and the Commonwealth Court's ruling gives preferential treatment to these coal estate owners by eliminating an essential evidentiary burden. Like any other owner of property rights claiming a de facto taking, the Coal Companies must prove, inter alia, that the government's action substantially deprived the owner of the beneficial use and enjoyment of the property. In the matter before us, there is no dispute that the only use of the Coal Companies' subsurface rights is a coal extraction operation. It is the only use and thus the highest and best use. This use is implicit in the Coal Companies' argument. Their claim is that they lost the ability to extract the coal because of their loss of access to the subsurface area. The ability to extract the coal is central to the takings claim. The coal estate owners have the burden to establish the existence of a use as a coal extraction site. Because the Coal Companies did not establish the feasibility of such use, the Coal Companies cannot establish that they have been deprived of the use by PennDOT's construction activity.

The use of property by surface rights owners and subsurface rights owners are distinct. The takings analysis, and its fact-intensive nature, properly permits courts to account for those distinctions. The de facto takings jurisprudence "is characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing

of all the relevant circumstances." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002). The Coal Companies' assertion that a de facto taking occurred by operation of law by virtue of ownership of subsurface rights requires a court to ignore all circumstances other than the loss of access.

Finally, the Commonwealth Court did not acknowledge any distinction between permitability, which was relevant to the legality of extracting the coal (and properly a focus of a de facto takings analysis) versus the economic **value** of the coal (a matter of damages). The Coal Companies, picking up on the Commonwealth Court's analysis, argue that the trial court and PennDOT suggest that "until a permit is secured there is no estate and **no value** in a coal estate." Coal Companies' Brief at 25. That charge is inaccurate. The value as determined by an economic analysis of what the coal is worth has no bearing on whether a taking occurred.[14] If the coal cannot be mined, the government took nothing. This is precisely the type of "speculative and conjectural" use that the caselaw holds cannot qualify as a de facto taking. We therefore agree with the trial court's legal conclusion that the Coal Companies failed to establish that a permit was reasonably likely to issue, and accordingly any taking was purely speculative and conjectural.

### The Sufficiency of the Evidence Regarding Permitability

Before the Commonwealth Court, the Coal Companies raised as a question for review whether the record lacked substantial evidence to support the trial court's

---

[14] For instance, whether the coal is worth $100 million, $50 million, or $100,000, DEP's decision to issue a permit has nothing to do with what the investor expects to make. What the coal is worth goes to **why** a mineral rights owner would seek a permit, but the DEP permit itself goes to **whether** a mine is opened. The latter is the focus for takings, the former is the focus for damages.

conclusion that the Coal Companies' ability to obtain approval from DEP for a surface mining permit for Parcel 55 was too speculative and uncertain. The Commonwealth Court, based upon its determination that the trial court erred in examining permitability at the preliminary objections stage of the proceedings, found it unnecessary to address the issue. *PBS Coals*, 206 A.3d at 1224 n.10. As we have concluded that the Commonwealth Court's ruling was in error, we will address whether sufficient evidence exists to support the trial court's conclusion that a DEP permit was not reasonably probable. As developed, the trial court's analysis implicates the condemnee's heavy burden to establish that a de facto taking occurred.

The trial court had the duty of weighing the evidence. *See Thomas A. McElwee & Son, Inc. v. SEPTA*, 896 A.2d 13, 21 (Pa. Commw. 2006) ("The trial court, as fact-finder, had the discretion to weigh the evidence and determine which was most credible[.]"). *aff'd sub nom. McElwee v. SEPTA*, 948 A.2d 762 (Pa. 2008). Appellate review then consists of deciding whether substantial evidence exists in the record to support the trial court's findings. *McElwee*, 948 A.2d at 771. As reviewed herein, the Coal Companies insist that their experts testified that the facts presented to the trial court established that a permit was reasonably probable, even without the completion of the different modules and questions surrounding the environmental issues. PennDOT's witness, Mr. Sammarco, without categorically ruling out the possibility of the issuance of a mining permit to the Coal Companies, provided the trial court with a number of reasons to seriously doubt the likelihood of any such eventuality.

Based upon our review of the record, we conclude that said record contains substantial evidence to support the trial court's finding that the issuance of a mining permit

to the Coal Companies was "speculative and uncertain." As reviewed in detail herein, *see* supra at 10-11, Mr. Sammarco testified that the Coal Companies had to date not conducted any stream or wetlands impacts studies or an overburdening analysis. One of PBS Coals' testifying experts, Mr. Kudlawiec, was not even aware of the existence of an intermittent stream running through the area until the time of his testimony before the trial court. This failure to study stream and wetlands impacts was particularly concerning to Mr. Sammarco, as two previous mining operations by PBS Coals in the same area ("Job 21" and the Black Mountain site) resulted in serious pollution to water supplies. At the evidentiary hearing, PBS Coals offered testimony to allay fears that an additional mining operation would not exacerbate the damage already done by PBS Coals to the water supply in the area. Mr. Kudlawiec's suggestion that PBS Coals would use up to four times the usual amount of an alkaline solution to mitigate acid discharges would, according to Mr. Sammarco, provide an additional level of concern in reviewing the permit application. The existence of an endangered species was another impediment. Finally, a note in DEP's files generated after a 2005 meeting with PBS Coals' representatives stated that permitting additional coal reserves at the location at issue was low given the significant potential "for generating additional pollution."

Based upon this evidence admitted by the DEP, the trial court was well within its province as the finder of fact to conclude that the issuance of a mining permit to the Coal Companies to commence a new mining operation was unlikely to occur.

<u>Consequential damages for loss of access</u>

By holding a de facto taking occurred, the Commonwealth Court did not address the claim for consequential damages. As previously discussed, consequential damages

are available even if a taking has not occurred. The Coal Companies' second count incorporated the foregoing complaints and argued that the coal "has been permanently isolated by PennDOT ... [by] taking the only access PBS and Penn Pocahontas had to and from [Parcel 55] from a public road." Petition, 2/19/2015, at 7.

The Coal Companies conceded that consequential damages are unavailable by virtue of the Commonwealth Court's holding that a de facto taking occurred, which we have reversed. PennDOT, on the other hand, argues that it intends to defend the remaining consequential damages claim. We express no opinion on this matter, as the parties have had no opportunity to litigate this aspect of the case.

## Conclusion

We reverse the decision of the Commonwealth Court and, for the reasons discussed in this opinion, reinstate the trial court's determination that no taking occurred. We remand the case to the Commonwealth Court with directions to remand to the trial court for consideration of the Coal Companies' claim for consequential damages.

Chief Justice Saylor and Justices Baer, Todd, Dougherty and Wecht join the opinion.

Justice Mundy files a dissenting opinion.